**2016-1992**

# United States Court of Appeals
# for the Federal Circuit

SECURUS TECHNOLOGIES, INC.,

*Appellant,*

*v.*

GLOBAL TEL\*LINK CORPORATION,

*Appellee.*

*Appeal from the United States Patent and Trademark Office*
*Before the Patent Trial and Appeal Board in*
*Case No. IPR2014-01278, U.S. Patent No. 7,860,222*

## APPELLANT SECURUS TECHNOLOGIES, INC.'S
## CORRECTED OPENING BRIEF

Jeffrey R. Bragalone
Justin B. Kimble
Daniel F. Olejko
Terry A. Saad
BRAGALONE CONROY PC
2200 Ross Ave., Suite 4500W
Dallas, Texas 75201
214-785-6670

*Counsel for Appellant*
*Securus Technologies, Inc.*

Dated: August 19, 2016

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Securus Technologies, Inc. certifies the following:

1. The full name of every party or amicus represented by me is:

   Securus Technologies, Inc.

2. The name of the real party in interest represented by me is:

   N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Securus Technologies, Inc. has no parent company and no other publicly held company owns 10% or more of Securus Technologies, Inc.'s stock.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   Bragalone Conroy PC: Jeffrey R. Bragalone, Justin B. Kimble, Daniel F. Olejko, Terry A. Saad, T. William Kennedy, Nicholas C. Kliewer


Date: August 19, 2016          */s/ Jeffrey R. Bragalone*
                                Signature of Counsel

i

# TABLE OF CONTENTS

*Page*

STATEMENT OF RELATED CASES ................................................................. 1

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUE .......................................................................... 1

STATEMENT OF THE CASE ........................................................................... 2

INTRODUCTION .............................................................................................. 3

STATEMENT OF THE FACTS ........................................................................ 3

    A.  The '222 Patent ...................................................................................... 3

    B.  The Present IPR ...................................................................................... 5

        1.  Brown ............................................................................................ 5

        2.  Motion to Amend ........................................................................ 6

SUMMARY OF ARGUMENT .......................................................................... 7

STANDARD OF REVIEW ............................................................................... 9

ARGUMENT ..................................................................................................... 10

    A.  The Board Erroneously Found That GTL Has Proven Independent
        Claims 1and 21 to be Unpatentable ............................................... 10

        1.  The Board Incorrectly Relied Upon an Argument Not Advanced
            by GTL to Identify the "Word Search Module" of Claim 1 ............... 10

        2.  The Board Erroneously Relied on GTL's Deficient Alternative
            Position for Identification of the "Word Search Module." ................... 12

        3.  The Board's Findings of Unpatentability of Claim 21 are Wholly
            Conclusory and Unsupported by Reasoning .......................................... 14

        4.  The Board's Findings Erroneously Relied on the Opinions of Dr.
            Kaza ........................................................................................................... 17

B.   The Board Incorrectly Relied on Conclusory Statements and Arguments Not Advanced by GTL to Identify the "Videoconferencing" of Claim 6.................................................. 18

C.   The Board Applies an Unreasonably Broad Claim Construction to Claim 16. ................................................................................. 19

D.   The Board's Analysis of Dependent Claims 3, 8, 14, 15, 17, 19, 22-30, 31, 32, 34, 35, and 36 Contains Manifest Legal Errors. ...................... 22

E.   The Board Improperly Shifted the Burden of Proof to Securus To Show the Proposed Combinations Were Not Obvious. ............................ 25

1.   GTL Failed to Prove Brown Would Have Been Obvious to Combine with Gainsboro. ...................................................... 25

2.   GTL Failed to Prove Brown Would Have Been Obvious to Combine with Hong Kong. .................................................. 27

F.   The Board Erred in Denying the Motion to Amend.................................. 29

1.   The Proposed Amendments Responded to a Ground of Unpatentability ......................................................................... 30

2.   The Original Disclosure Supported the Proposed Amendments .......... 32

CONCLUSION AND REQUESTED RELIEF ..................................................... 34

ADDENDUM

Final Written Decision.................................................... Appx0001

U.S. Patent No. 7,860,222 ............................................. Appx0101

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ...........................................................25

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
  616 F.3d 1249 (Fed. Cir. 2010) ...........................................................20

*Belden Inc. v. Berk-Tek LLC*,
  805 F.3d 1064 (Fed. Cir. 2015) ...........................................................12

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) .....................................................................9, 32

*Cutsforth, Inc. v. MotivePower, Inc.*,
  636 Fed.Appx. 575 (Fed. Cir. 2016) ......................................... 16, 19, 22, 23, 24

*Dell v. Acceleron, LLC*,
  818 F.3d 1293 (Fed. Cir. 2016) ..................................................... 19, 33

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
  800 F.3d 1375 (Fed. Cir. 2015) ..................................................... 15, 24

*In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268 (Fed. Cir. 2015),
  *aff'd Cuozzo Speed Techs., LLC v. Lee*,
  No. 15-446, 136 S. Ct. 2131 (June 20, 2016) ...........................................9

*In re Donaldson Co.*,
  16 F.3d 1189 (Fed. Cir. 1994) .............................................................9

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006) ............................................................26

*In re Kotzab*,
  217 F.3d 1365 (Fed. Cir. 2000) ..................................................... 19, 22

iv

*In re Magnum Oil Tools Int'l, Ltd.*, No. 2015-1300, --- F.3d ----,
    2016 WL 3974202 (Fed. Cir. July 25, 2016) ...... 10, 14, 18, 19, 20, 24, 25, 26, 27

*In re Morsa*,
    713 F.3d 104 (Fed. Cir. 2013) .............................................................9

*In re Rouffet*,
    149 F.3d 1350 (Fed. Cir. 1998) ................................................... 19, 22

*KSR Int'l v. Teleflex Inc.*,
    550 U.S. 398 (2007) ................................................................... 27, 28

*Microsoft Corp. v. Proxyconn, Inc.*,
    789 F.3d 1292 (Fed. Cir. 2015) .........................................................22

*Randall Mfg. v. Rea*,
    733 F.3d 1355 (Fed. Cir. 2013). ..........................................................9

*SAS Inst., Inc. v. ComplementSoft, LLC*,
    No. 2015-1347, 2016 WL 3213103 (Fed. Cir. June 10, 2016) ...........................12

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015)........................................................................9

*Unigene Labs., Inc. v. Apotex, Inc.*,
    655 F.3d 1352 (Fed. Cir. 2011) ................................................... 27, 29

**Statutes**

5 U.S.C. § 556(d) ...............................................................................33

35 U.S.C. § 254..................................................................................30

37 C.F.R. § 42.121 ..........................................................................2, 31

## STATEMENT OF RELATED CASES

No other appeal in or from this case has been before either this Court or any other appellate court. The undersigned counsel is aware of another appeal currently pending before this Court that involves the same patent in this appeal: *Securus Technologies, Inc. v. Global Tel\*Link Corporation*, No. 2016-1993 (docketed May 4, 2016). There is another case pending before the Patent Trial and Appeal Board that involves the same patent in this appeal: *Global Tel\*Link Corporation v. Securus Technologies, Inc.*, Case CBM2015-00145 (filed on May 19, 2015).

## STATEMENT OF JURISDICTION

This Court's jurisdiction over this appeal is governed by 28 U.S.C. § 1295 (a) (4) (A). Pursuant to Rule 28 (a) (5), Securus represents that the judgement appealed from is final.

## STATEMENT OF THE ISSUE

This appeal concerns the following issues:

1.      Did the Patent Trial and Appeal Board err in finding claims 1-36 of U.S. Patent No. 7,860,222 unpatentable as obvious in view of the following prior art references:

- U.S. Patent Publication No. 2004/0081296 A1 ("Brown")

- Brown and U.S. Patent No. 6,064,963 ("Gainsboro") (claims 2, 11, 13, 22-30)

- Brown and Human Rights Watch, *Hong Kong: Prison Conditions in 1997*, March 1, 1997 ("Hong Kong") (claim 4)

- Brown and U.S. Patent No. 6,668,045 ("Mow") (claim 5)

- Brown and U.S. Patent No. 7,191,133 ("Pettay") (claim 6)

- Brown and Gainsboro and U.S. Patent No. 6,141,406 ("Johnson") (claim 12)

- Brown and U.S. Patent Publication No. 2003/01236470 A1 ("Crites") (claim 20)

- Brown and U.S. Patent Publication No. 2004/0029564 A1 ("Hodge") (claims 7, 9, 16)

2.    Did the Patent Trial and Appeal Board err in finding that Securus had not demonstrated that its Motion to Amend claims 15-20 met the requirements set forth in 37 C.F.R. § 42.121.

## STATEMENT OF THE CASE

On August 12, 2014, Global Tel*Link ("GTL") petitioned for *inter partes* review ("IPR") of U.S. Patent No. 7,860,222. Petition, Appx0038-0100 ("Pet."). On February 6, 2015, the Patent Trial and Appeal Board instituted the IPR. Institution Decision, Appx1120-1145 ("Inst. Dec."). Following briefing and oral argument, on January 21, 2016, the Board found claims 1-36 of the '222 patent obvious in view of nine references: "Brown," "Gainsboro," "Hong Kong," "Mow," "Pettay,"

"Johnson," "Crites," and "Hodge." Final Written Decision, Appx0001-0037 ("Dec."). Securus Technologies, Inc. ("Securus") timely appealed.

## INTRODUCTION

This appeal raises legal errors by the Patent Trial and Appeal Board (the "Board") in finding all claims of the '222 patent to be unpatentable. The Board based its findings on an improperly-conducted obviousness analysis, insufficient evidence, incorrect claim constructions, and an improper shifting of the burden of production to Securus. For many claims the Board failed to provide any justification for its finding of obviousness. Thus, the Court should reverse the Board's finding of obviousness, and confirm the patentability of all claims of the '222 patent.

## STATEMENT OF THE FACTS

### A.    The '222 Patent

The '222 patent is entitled "Systems and Methods for Acquiring, Accessing, And Analyzing Investigative Information." The '222 patent "relates generally to information systems and, more particularly, to the acquisition, access, and/or analysis of investigative information." '222 patent, 1:44-46, Appx0112. In particular, the '222 patent discloses systems and methods to "provide location, collection, compilation, aggregation, distillation, and/or reporting of information heretofore unavailable or otherwise not readily available to investigators and other individuals." *Id.* at 4:32-35, Appx0113. The invention is applicable to a number "of

*controlled environment facilities* including inmate facilities (e.g., municipal jails, county jails, state prisons, federal prisons, military stockades, juvenile facilities, and detention camps), hospitals, nursing homes, camps, and the like. For example, information management and retrieval systems of the present invention may be disposed within such a controlled environment facility, or disposed remotely thereto having operator (user) terminals disposed within each of the different facilities and/or external thereto, to provide information management, movement and access uniquely suited for use with respect to such an environment." *Id.* at 4:49-59, Appx0113 (emphasis added).

The '222 patent has two independent claims, both of which are at issue on appeal:

> 1.  A system comprising:
>
> a communication services module operable to provide communications between individuals; and
>
> an investigative tools module in communication with said communication service module operable to allow a user to monitor said communications between individuals and to place event identifiers in association with said communications between individuals, said event identifiers comprise a plurality of bookmarks representing different events of interest; and
>
> said investigative tools module comprises a word search module to identify particular words within said communications between individuals and place event identifiers in association therewith.

*Id.* at 34:8-21, Appx0128.

4

21. A method comprising:

   providing communications between individuals;

   recording said communications between individuals;

   monitoring said communications between individuals, said monitoring comprises logic of a call processing system analyzing content of said communications between individuals; and

   placing a plurality of event identifiers in association with a recorded one of said communications between individuals based upon events detected by said monitoring.

*Id.* at 35:26-35, Appx0129.

## B.   The Present IPR

GTL's petition for IPR was entirely obviousness-based; it is undisputed that no reference discloses all features of any '222 patent claim. The Board relied upon eight references in erroneously determining that the claims of the '222 patent are obvious. Common to each of the Board's eight obviousness findings is U.S. Patent Publication No. 2004/0081296 A1 ("Brown"). Further, the Board erroneously denied Securus' requests to file a Certificate of Correction and subsequently a Motion to Amend to correct the dependency of dependent claims 15-20. Order, Appx1201-1206; Dec., 33-34, Appx0033-0034.

### 1.   Brown

Brown is entitled "System and Method for Processing Personal Telephony Recorder Commands," and was assigned to International Business Machines Corporation. Brown, Appx0718. Brown makes no mention of being used within

"controlled environments" as disclosed repeatedly by the '222 patent. Because it is directed to different technology and field of use, Brown also fails to disclose multiple claimed limitations.

### 2.     Motion to Amend

Further, six dependent claims of the '222 patent contain an error that Securus sought to correct through a Certificate of Correction, which was denied by the Board. Order, Appx1201-1206. Specifically, as issued, claims 15-20 depend directly from independent claim 1. However, each of claims 15-19 require an antecedent basis for the limitation "said information associated with said monitored one of said communications between individuals." '222 patent, 35:1-25, Appx0129. Similarly, claim 20 requires antecedent basis for the requirement of "said data interface." *Id.* at 35:24-25. Claim 1 does not contain the "said information" and "said data interface" limitations, but claim 14 does. *Id.* at 34:64-67, Appx0128. Claims 14-20 as issued are shown below:

> 14. The system of claim 1, wherein said investigative tools module comprises **a data interface** providing **information associated with a monitored one of said communications between individuals** to said user.

> 15. The system of claim 1, wherein **said information associated with said monitored one of said communications between individuals** comprises a communication timeline having said one or more said event identifiers placed in association therewith.

> 16. The system of claim 1, wherein **said information associated with said monitored one of said communications between**

**individuals** comprises identification of at least one of said individuals.

17. The system of claim 1, wherein **said information associated with said monitored one of said communications between individuals** comprises interactive information presentation allowing said user to obtain additional desired information.

18. The system of claim 1, wherein **said information associated with said monitored one of said communications between individuals** comprises prompts to guide said user with respect to said placing event identifiers.

19. The system of claim 1, wherein **said information associated with said monitored one of said communications between individuals** comprises controls to facilitate said user controlling one or more aspect of said monitoring said a selected one of said communications between individuals.

20. The system of claim 1, wherein **said data interface** comprises an interactive web page.

*Id.* at 34:64-35:25, Appx0128-0129 (emphasis added).

Instead of authorizing Securus to file a Certificate of Correction to address the clear dependency error, the Board ruled that "a motion to amend claims is the appropriate vehicle for [Securus] to address its concerns regarding the dependency of claims 15-20." Order, 3, Appx1203. However, the Board then denied Securus' Motion to Amend. Dec., 34, Appx0034.

## <u>SUMMARY OF ARGUMENT</u>

The Board's obviousness analysis, resulting in the finding of unpatentability of all claims of the '222 patent, failed to hold GTL to the requisite burden of proof. GTL was required to show by a preponderance of the evidence for any challenged

claim that the cited combination of prior art rendered the claimed invention obvious to one of ordinary skill in the art. GTL failed to meet its burden for any claim.

The Board erred in finding that GTL met its burden to provide that all claims are obvious and based its findings on an insufficient analysis, and in many cases, an undisclosed rationale. Where the Board did attempt to explain its rationale, there was clear error. The Board's erroneous findings rely on arguments that GTL had not advanced, or improperly advanced as new arguments on Reply. Additionally, the Board's erroneous findings applied overly broad claim constructions that expand the scope of the claims improperly and inconsistently with the specification of the '222 patent.

In many cases where GTL failed to provide sufficient evidence to prove the claims obvious, the Board improperly shifted the burden of production to Securus to prove the claims patentable. But it is never the patent owner's burden to prove patentability in an *inter parte* review.

For more than half of the patent claims, the Board dismissed the claims as obvious, without any explanation at all. The Board's cursory treatment of the patent claims cannot justify a finding of unpatentability. The Board must provide the rationale for its findings, and failed to do so.

Finally, the Board erred by denying Securus' Motion to Amend to correct the dependency of the patent claims. The amendment was sought to correct an obvious

claim drafting error that, when corrected, illustrated the patentability of the amended claims over the cited prior art. The Board's decision to deny the Motion to Amend was incorrectly based on a finding that Securus had not met its burden.

Accordingly, the Board's errors have resulted in an unjustified result. The Board's Decision should be reversed and all claims found patentable over the cited prior art.

## STANDARD OF REVIEW

The propriety of a decision of the Board canceling a patent pursuant to 35 U.S.C. § 103 is a question of law with underlying issues of fact. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). This Court reviews the Board's legal conclusion of obviousness *de novo*, and the underlying factual findings for substantial evidence. *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015), *aff'd Cuozzo Speed Techs., LLC v. Lee*, No. 15-446, 136 S. Ct. 2131 (June 20, 2016). In the absence of disputed fact issues, this Court reviews the claim construction determinations of the Board *de novo*. *In re Donaldson Co.*, 16 F.3d 1189, 1192 (Fed. Cir. 1994) (en banc); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840-41 (2015). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013).

9

## **ARGUMENT**

**A.    The Board Erroneously Found That GTL Has Proven Independent Claims 1 and 21 to be Unpatentable**

**1.    The Board Incorrectly Relied Upon an Argument Not Advanced by GTL to Identify the "Word Search Module" of Claim 1.**

The Board erred in finding that "components of Brown's command processing component 340, including data mining component 385, word indexing component 390, *bookmarking component 345*, and querying component 395, constitute a 'word search module,' while Brown's voice receiver, command filter 215, voice-text converter 245, digital transmitter 285, email/computer system 282, and bookmarking component 345 collectively constitute an 'investigative tools module,'" because this was not a position advanced by GTL in the Petition. Dec., 19, Appx0019 (emphasis added); *see In re Magnum Oil Tools Int'l, Ltd.*, No. 2015-1300, --- F.3d ----, 2016 WL 3974202, at *10 (Fed. Cir. July 25, 2016) ("[T]he Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond."). GTL presented two alternative theories in the Petition that Brown disclosed the "word search module" limitation of claim 1. Pet., 16-17, Appx0058-0060, but neither included bookmarking component 345, as credited by the Board.

First, GTL argued that the "word search module" in Brown is comprised of "data mining component 385, word indexing component 390, and querying

component 395." *Id*. at 16-17, Appx0058-0060. Notably, under this theory, GTL did not argue that bookmarking component 345 is one of the components comprising the "word search module." Instead, GTL contends in the Petition that these components (i.e., the components identified as comprising the "word search module") "together with Brown's voice receiver, command filter 215, voice-text converter 245, digital transmitter 285, email/computer system 282, and *bookmarking component 345* collectively constitute the recited 'investigative tools module.'" *Id*. (emphasis added). Thus, GTL identified in the Petition the bookmarking component 345 separately as a component of the "investigative tools module," but *not* a component of the "word search module."

In response to Securus' rebuttal, GTL proposed a *new and improper* argument in its Reply. Securus demonstrated that the "word search module" identified by GTL in this first theory does not "identify particular words within said communications between individuals," and "place event identifiers in association therewith," particularly because the bookmarking component 345 was not alleged by GTL to be part of the word search module. PO Resp., 8-9, Appx1214-1215. GTL then argued in its Reply that "it would have been obvious to [include bookmarking component 345 within Brown's alleged word search module] based on the abstract definition of 'module' and Brown's disclosure that the bookmarking component 345 and data mining 385 are subcomponents of a common command processing 340." Pet. Reply,

11

7, Appx1584. But this new argument should not have been considered by the Board. *SAS Inst., Inc. v. ComplementSoft, LLC*, No. 2015-1347, 2016 WL 3213103, at *7 (Fed. Cir. June 10, 2016) ("An agency may not change theories in midstream without giving respondents reasonable notice of the change and the opportunity to present argument under the new theory.") (interpreting 5 U.S.C. § 554(b)(3)) (quoting *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015) (internal quotations omitted). Because the Board's Decision makes clear that its finding of obviousness relied upon an inclusion of bookmarking component 345 as part of the "word search module" of Brown, the Board erred and its finding should be reversed.

### 2. The Board Erroneously Relied on GTL's Deficient Alternative Position for Identification of the "Word Search Module."

In view of Securus' argument that GTL did not separately identify an "investigative tools module" and a "word search module" in Brown (*see* PO Resp., 14-16, Appx1220-1222), the Board relies on GTL's alternative argument that the "word search module" is taught by Brown's disclosure of "annotation of data for word searching." Dec., 19, Appx0019. But, Securus' Response demonstrates that even GTL's "alternative" argument is plagued by deficiencies and inconsistencies. PO Resp., 12-14, Appx1218-1220. The Board's Decision provides no analysis that addresses the deficiencies of GTL's alternative argument identified by Securus.

Instead, the Board erroneously conflated the primary argument of GTL— including the identification of data mining component 385, word indexing

component 390, bookmarking component 345 (importing the same error discussed above), and querying component 395, as the components comprising the "word search module"—with the alternative *functionality* of "annotating the data for word searches" as the claimed "plac[ing] event identifiers at particular words." Dec., 19, Appx0019. But neither GTL, nor the Board, tie this functionality to the identified components of Brown's "word search module." GTL's alternative argument is incomplete because it does not identify the components of Brown that would perform the "annotation" as a "word search module." Nor did GTL argue that the "annotation" could be performed by the components identified in its primary argument. The Board's reliance on this alternative embodiment is, therefore, plagued by the same lack of evidence. The Board made no finding that the components of Brown that it contends comprise the "word search module"—namely the data mining component 385, word indexing component 390, bookmarking component 345, and querying component 395—would also perform the annotating of the call data.

The error in the Board's Decision is evident from Figure 41 of Brown. *See* PO Resp., 12-14, Appx1218-1220. Figure 41 shows the "PTR *User*" performing the annotations of recorded calls. It does not show a "word search module" performing the annotations. Thus, GTL's identification of the annotation functionality, and the Board's reliance on the same, fails to show "a word search module to identify

particular words within said communications between individuals and place event identifiers in association therewith." Instead, it merely shows that a user can annotate recorded call data by manually searching the call data. The Board's reliance on GTL's alternative annotation functionality is improperly combined with the components identified as the "word search module" in GTL's primary argument. GTL did not advance this combination in the Petition, nor does the Board provide support for the combination in the Decision. *Magnum Oil Tools*, 2016 WL 3974202, at *10 ("[T]he Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond."). Accordingly, the Board's finding of unpatentability of claim 1 is reversible error.

### 3.     The Board's Findings of Unpatentability of Claim 21 are Wholly Conclusory and Unsupported by Reasoning

The Board's Decision that Brown discloses the limitations of claim 21 relies on a mere restatement of the opinion it provided in the Institution Decision:

> Given this information, we are persuaded by Petitioner's proposition, as supported by Dr. Kaza's Declaration, that voice data converted to text data and displayed on a display device, as taught by Brown (*see* Pet. 27; Ex. 1007 ¶ 80), meet the limitation of "monitoring said communications between individuals, said monitoring comprises logic of a call processing system analyzing content of said communications between individuals," as required by claim 21.

Dec., 21, Appx0021. But this opinion is wholly conclusory and fails to account for the higher burden of proof required of the petitioner to ultimately carry its burden of persuasion. Specifically, while the standard for instituting the trial is a "reasonable

likelihood of prevailing" on its assertion that claim 21 is obvious over Brown, GTL must ultimately show by a preponderance of the evidence that claim 21 is unpatentable. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) ("In an inter partes review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee."). The Board provided no explanation and cites to no additional evidence to account for this significantly higher burden of proof applied to its finding in a Final Written Decision.

The Board failed to address Securus' argument that Brown's disclosure does not indicate any analysis of the *content of the communications* between individuals. *See* PO Resp., 31-32, Appx1237-1238. The Board acknowledged the arguments made by Securus, but offered no explanation as to how its conclusion is reconciled with Securus' position. Instead, the Board credited Dr. Kaza's mere citation to Brown for disclosing (i) processing commands received during the call and (ii) converting commands to text, and (iii) searching call data for a particular word or phrase. Dec., 21, Appx0021. Notably, GTL does not cite to Dr. Kaza in support of its arguments in the Petition. *See* Pet., 27, Appx0069. In fact, GTL's entire argument was based on a lone citation to Brown in the Petition establishing that "the personal telephony recorder user can follow the conference call by reading the data displayed on the

display device," followed by a conclusory statement that Brown discloses the limitation. *Id.*

But even if GTL did cite to Dr. Kaza's Declaration, Dr. Kaza's testimony demonstrates that the quotation from Brown relied upon by the Petition established only that "Brown's technology includes the ability *to monitor the communications* between individuals." Kaza Decl., ¶ 84, Appx0427-0428. By Dr. Kaza's admission, the lone citation of the Petition does not establish "*analyzing content* of said communications between individuals." Instead, Dr. Kaza provided two additional citations to Brown, not cited by the Petition, that refer to the processing of *commands* and converting those commands to text. *Id.* Dr. Kaza did not provide any analysis that explains how the conversion of commands to text discloses the analyzing of the *content of a communication between individuals*. Command processing is clearly different from the automatic analysis of the content of a conversation. But Dr. Kaza failed to reconcile this difference, and neither does the Board in relying upon the testimony of Dr. Kaza. A well-reasoned analysis concluding that Brown discloses this limitation, by necessity, must explain the reason such command processing would render the analysis of conversation content obvious. The Board erred in failing to provide such analysis. *Cutsforth, Inc. v. MotivePower, Inc.*, 636 F.App'x 575, 577-578 (Fed. Cir. 2016) (vacating and remanding PTAB obviousness

determination because of lack of explanation of why the reference(s) render the claims obvious).

Further, as argued in Securus' Response, the key-word search cited by Dr. Kaza is not performed by an automated process using logic elements; it is done by humans whispering search terms to the personal telephony recorder. PO Resp., 32, Appx1238 (citing Brown at [0071], [0105], [0204], and [0210]). The Board construed the claim term "logic of a call processing system" as encompassing automated processes performed using logic elements and not encompassing processes performed solely by human action. Inst. Dec., 10, Appx1129. The whispering of voice commands to initiate a word search is certainly not an automated process, and as such, falls outside the scope of the Board's claim construction.

The Board's conclusory opinion, imported from its Institution Decision, fails to provide reason that GTL's citation to the conversion of text for display or Dr. Kaza's citation to Brown's command processing or word searching initiated by a human teaches "logic of a call processing system analyzing content of said communications." Accordingly, the Board's decision that claim 21 is unpatentable is reversible error.

### 4.    The Board's Findings Erroneously Relied on the Opinions of Dr. Kaza.

GTL did not cite to the Declaration of Dr. Kaza for any of its arguments in Ground 1 of the Petition. Therefore, the Board erred in relying upon the opinions of

Dr. Kaza that were not advanced by GTL in support of its arguments in the Petition. *Magnum Oil Tools*, 2016 WL 3974202, at *10. The Board's incorporation of Dr. Kaza's opinions into the arguments of GTL is an improper supplementation of GTL's arguments. *Id.* ("[W]e find no support for the PTO's position that the Board is free to adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner during an IPR."). GTL's failure to cite to the opinions of Dr. Kaza is not correctable by the mere fact that Dr. Kaza's Declaration was submitted as part of the record. The Board is not free to supplement the arguments of GTL to support its ultimate conclusions. *Id.* Because the Board's Decision relies upon the opinions of Dr. Kaza (*see e.g.*, Dec., 18-20, Appx0018-0020), the Board's finding of unpatentability of claims 1 and 21 must be reversed.

### B.    The Board Incorrectly Relied on Conclusory Statements and Arguments Not Advanced by GTL to Identify the "Videoconferencing" of Claim 6.

The Board's conclusion that "Brown establishes a telephone conference between two or more users (Ex. 1007 ¶¶ 2, 13), such that the extension to video conferencing would have been obvious" is both conclusory and a new argument not advanced by GTL. Dec., 31, Appx0031.

Despite GTL's sole reliance upon the combination of Brown with Pettay to establish that the limitations of claim 6 would have been obvious, the Board ignored the disclosure of Pettay in its entirety and bases its finding on the mere conclusion

that claim 6 was obvious in view of Brown. Dec., 31, Appx0031. This position was not advanced by GTL and therefore could not have been proven by a preponderance of evidence. *Magnum Oil Tools*, 2016 WL 3974202, at *10 ("[T]he Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond.").

No additional analysis, beyond its mere conclusion, is provided by the Board. "In a case of obviousness, the Board must explain why a person of ordinary skill in the art would modify the prior art references to create the claimed invention." *Cutsforth*, 636 F.App'x. at 577-78  (citing *In re Kotzab*, 217 F.3d 1365, 1371 (Fed. Cir. 2000); *In re Rouffet*, 149 F.3d 1350, 1359 (Fed. Cir. 1998)) (vacating and remanding a PTAB obviousness determination because of lack of explanation of why the reference(s) render the claims obvious).

The finding of the Board does not meet the standards set by this Court in both *Cutsforth* and *Magnum Oil Tools*. For both of these reasons, the Board's decision that claim 6 is unpatentable is erroneous and should be reversed.

### C.    The Board Applies an Unreasonably Broad Claim Construction to Claim 16.

In finding that claim 10 was proven obvious by GTL, the Board adopts a new argument made by GTL for the first time in its Reply that was not advanced in the Petition, and therefore erred in its finding. *Dell v. Acceleron, LLC*, 818 F.3d 1293,

1300-1301 (Fed. Cir. 2016) (vacating Board ruling based upon argument raised for first time in reply) ("We vacate the Board's ruling, holding that the Board denied Acceleron notice and a fair opportunity to respond to this basis of cancellation."); *see also Magnum Oil Tools*, 2016 WL 3974202, at \*10 ("[T]he Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond."). Claim 10 requires that "said investigative tools module further allows said user to control one or more aspects of said communications between individuals." '222 patent, 34:52-54, Appx0128. But in the Petition, GTL failed to identify in Brown a "user" that can both "monitor said communication between individuals" (as required by claim 1) and "control one or more aspects of said communications between individuals" (as further required by claim 10, depending from claim 1). PO Resp., 17-18, Appx1223-1224. Instead, GTL merely identified a participant (i.e. individual) to a conference call that can "instruct the personal telephony recorder to allow the requestor to join the call or to deny the request." *Id*. The "participant" cannot be both the "user" and the "individual." *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct component[s] of the patented invention."). Despite this established tenant of patent law, GTL impermissibly argued for the first time in Reply that "nothing in Brown prevents the 'personal

telephony recorder user' to also be the 'prospective participant.'" Pet. Reply, 12, Appx1589.

Despite Securus' argument that the "individuals" and "user" are separate limitations in the claim and therefore must be identified separately in the prior art, the Board adopted GTL's untimely argument that the "participant" in the conference call could also be the "personal telephony recorder user," stating: "We do not agree with Patent Owner's position, because we do not read Brown to exclude the 'personal telephony recorder user' from being a 'participant.'" Dec., 21-22, Appx0021-0022.

Under this apparent interpretation, the Board has applied an unreasonably broad construction to the "user" of claim 10 that is contrary to the specification of the '222 patent. The "user" is delineated from the "individuals" participating in the communication by both the claim language and the specification. The "user" is referred to in the claims as the person allowed to monitor and control aspects of the communications between "individuals." In the specification, the "user" is consistently referred to as the investigator or operator having access to the investigative tools to monitor and control aspects of the communications between individuals. *See e.g.*, '222 patent, 4:56, 6:65-7:1, 12:37-45, 22:37-64, Appx0113-0115, Appx0117, Appx0122. The Board's attempt to broaden the "user" to also be an "individual" party to the communication is broader than any disclosed

embodiment of the '222 patent and therefore unreasonable. *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) (vacating and remanding decision based upon unreasonably broad construction) ("Even under the broadest reasonable interpretation, the Board's construction cannot be divorced from the specification and the record evidence, and must be consistent with the one that those skilled in the art would reach. A construction that is unreasonably broad and which does not reasonably reflect the plain language and disclosure will not pass muster." (internal citations omitted)). On this basis, the Board's analysis is flawed and its findings should be reversed.

### D. The Board's Analysis of Dependent Claims 3, 8, 14, 15, 17, 19, 22-30, 31, 32, 34, 35, and 36 Contains Manifest Legal Errors.

This Court recently held that "[i]n a case of obviousness, the Board must explain why a person of ordinary skill in the art would modify the prior art references to create the claimed invention." *Cutsforth*, 636 F.App'x. at 577-78 (citing *In re Kotzab*, 217 F.3d at 1371; *In re Rouffet*, 149 F.3d at 1359). The Board's decision here fell woefully short of that instruction, particularly with respect to twenty dependent claims for which the Board provided no rationale in support of its determination that they are unpatentable. Dec., 23, 28, Appx0023, Appx0028.

The Court's discussion in *Cutsforth* is instructive:

> In this case, ***the Board made broad, conclusory statements*** in its analysis to determine that the claims of the '018 patent are obvious. The majority of the Board's Final Written Decision is

> spent summarizing the parties' arguments and offers only conclusory analysis of its own. While the decision does specify when it is rejecting a party's argument, the Board does not explain why it accepts the remaining arguments as its own analysis. ***This leaves little explanation for why the Board found the claimed invention obvious.***

*Cutsforth*, 636 F.App'x. at 577-78 (emphasis added). Notwithstanding this direction from this Court, the Board summarily concluded that claims 3, 8, 14, 15, 17, 19, 31, 32, 34, 35, and 36 are unpatentable without any discussion as to why.

These claims were only subject to IPR with respect to one ground—alleged obvious in view of Brown. The entirety of the Board's discussion of these claims is the following paragraph:

> After consideration of the language recited in claims 3, 7–10, 14–19, and 31–36 of the '222 patent, the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers, we find that one of ordinary skill in the art would have considered these dependent claims obvious over Brown. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 3, 7–10, 14–19, and 31–36 of the '222 patent are unpatentable under 35 U.S.C. § 103(a) in view of Brown.

Dec., 23, Appx0023. Having only briefly analyzed claims 10, 16, and 33, the Board reached the foregoing conclusion, even though each claim contains additional limitations for which the Board provided no analysis. *Id.* at 21-23, Appx0021-0023.

The same is true for the Board's finding that claims 22-30 are unpatentable over the combination of Brown with Gainsboro. Dec., 28, Appx0028. The Board provided the same summary paragraph for these claims containing no analysis or rationale for its findings:

> After consideration of the language recited in claims 22–30 of the '222 patent, the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers, we find that one of ordinary skill in the art would have considered these dependent claims obvious over Brown in view of Gainsboro. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 22–30 of the '222 patent are unpatentable under 35 U.S.C. § 103(a).

Dec., 28, Appx0028.

Securus is left with no understanding of the Board's basis for its conclusion that these twenty claims are unpatentable. This is also impermissible in light of the Court's recent decision in *Magnum Oil Tools*, where the Court reaffirmed that "[i]n an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee." *Magnum Oil Tools*, 2016 WL 3974202, at *6 (quoting *Dynamic Drinkware*, 800 F.3d at 1378). Like the facts of *Magnum Oil Tools*, the Final Written Decision here "is replete with examples where, rather than require [GTL] to prove its assertion of obviousness, the Board improperly shifted the burden to [Securus] to disprove obviousness." *Id.* at *8. Thus, under *Cutsforth*

24

and *Magnum Oil Tools*, the Board's conclusory determination, devoid of analysis, is legally flawed and should be reversed.

### E. The Board Improperly Shifted the Burden of Proof to Securus To Show the Proposed Combinations Were Not Obvious.

#### 1. GTL Failed to Prove Brown Would Have Been Obvious to Combine with Gainsboro.

GTL and Dr. Kaza merely relied on general and unsupported statements to establish that the proposed combination of Brown with Gainsboro would have involved known methods and yielded predictable results. *See* Kaza Decl., ¶¶ 100-102, Appx0435-0436; Pet., 34, Appx0076. Both the Petition and Dr. Kaza's declaration have the same boilerplate language: "[a] person of ordinary skill in the art could have combined the functions of Gainsboro with the system of Brown by known methods. The results of the combination would have been predictable to a person of ordinary skill in the art." *Id.* Dr. Kaza did not explain the differences between the two prior art references, nor does he explain the how, what, and why of the proposed combinations. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (finding that obviousness testimony was "conclusory and factually unsupported" where the expert "never provided any factual basis for his assertions," "failed to explain how specific references could be combined, [and] which combination(s) of elements in specific references would yield a predictable result," rendering the expert's testimony "essentially a conclusory

statement that a person of ordinary skill in the art would have known . . . how to combine any of a number of references to achieve the claimed inventions."). Moreover, Dr. Kaza's Declaration merely repeated the same argument from the Petition without any articulated reasoning with some rational underpinning. *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). Repetition of the same arguments by an expert does not give that argument enhanced probative value.

In considering the sufficiency of GTL's showing of obviousness, the Board erred in shifting the burden of production to Securus. *Magnum Oil Tools,* 2016 WL 3974202, at *6 ("In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee."). The Board incorrectly sought proof from Securus, rather than focusing on GTL's failure to prove the proposition by the preponderance of the evidence: "We are not persuaded by Patent Owner's arguments, because they fail (1) to explain the differences between Brown and Gainsboro, (2) to rebut satisfactorily Petitioner's explanation of why a person of ordinary skill in the art would have combined the teachings of Brown and Gainsboro, and (3) to consider and rebut Petitioner's arguments regarding the collective teachings of Brown and Gainsboro from the perspective of one of ordinary skill in the art."

26

As recently confirmed by *Magnum Oil Tools*, the Board's shifting of the burden of production to Securus to establish that Gainsboro was not obvious to combine with Brown is error. *Magnum Oil Tools*, 2016 WL 3974202, at \*6. Accordingly, the Board's finding of obviousness based on the combination of Gainsboro and Brown should be reversed.

### 2.    GTL Failed to Prove Brown Would Have Been Obvious to Combine with Hong Kong.

Neither GTL nor Dr. Kaza provided an adequate reason to combine the Hong Kong reference with Brown, and neither demonstrated that the combination would have rendered the limitation of claim 4 obvious to one of ordinary skill in the art. "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l v. Teleflex Inc.,* 550 U.S. 398, 418 (2007). "Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Unigene Labs., Inc. v. Apotex, Inc.,* 655 F.3d 1352, 1360 (Fed. Cir. 2011) (internal citations omitted).

GTL's attempted combination of Brown with Hong Kong is a prime example of the problem *KSR* speaks to above, where patent challengers try to prove

obviousness "merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR,* 550 U.S. at 418. The Hong Kong reference is not a technical document. It is not even a document about monitoring inmate communications. Instead, it is a report by Human Rights Watch, an organization who defends the rights of people worldwide. PO Resp., 43, Appx1249. It purports to "investigate abuses, expose the facts widely, and pressure those with power to respect rights and secure justice. Human Rights Watch is an independent, international organization that works as part of a vibrant movement to uphold human dignity and advance the cause of human rights for all." *Id.* (quoting http://www.hrw.org/about.)

The Hong Kong reference is titled "Hong Kong: Prison Conditions in 1997." *See* Hong Kong at 2, Appx0801. And as the Preface notes, "the purpose of the investigation was to establish a benchmark of prison conditions prior to the [end of British colonial rule]. … This report, which is based primarily on information gathered during these inspections, describes and evaluates the treatment of prisoners confined in Hong Kong prisons under the authority of the Hong Kong Correctional Services Department (CSD)." *Id.* at 2-3, Appx0801-0802.

Specifically, the paper includes sections on "International Human Rights Standards Governing The Treatment of Prisoners," "Vietnamese Detention Camps," "Overcrowding," "Cells and Dormitories," "Bedding and Clothing," "Personal

Hygiene," "Medical Treatment and Disease Prevention," "Conditions for Vietnamese Asylum-Seekers," "Drugs, Gambling, Intimidation, and Violence," "The Mentally Ill," etc. *See generally Id.* at 4-33, Appx0803-0832. The idea that a person of ordinary skill in the art would have sought out, found, and selected this reference in the normal course of research is nonsensical, let alone that such a person would have been motivated to combine it with Brown "in the normal course of research and development to yield the claimed invention." *See Unigene Labs*, 655 F.3d at 1360. This is even more so because the Petitioner relies on only a mere footnote for the disclosure that purportedly supports its obviousness position. Pet., 41-42, Appx0083-0084.

GTL cites footnote 115 of Hong Kong for its alleged disclosure that inmates get the sense they are being monitored. *See* Pet., 41, Appx0083. This obscure reference would not have been identified by a person of ordinary skill in the art "during the *normal course of research and development* to yield the claimed invention." *Unigene*, 655 F.3d at 1360 (emphasis added). The Board's finding that this combination would have been obvious is not supported by substantial evidence, and should be reversed.

### F.     The Board Erred in Denying the Motion to Amend.

As described above, while issued claims 15-20 depend from claim 1, they contain limitations that do not find an antecedent basis within claim 1. This

dependency error was clearly a mistake in the patent incurred through the fault of the PTO and subject to a Certificate of Correction. 35 U.S.C. § 254. Securus requested for authorization to request a Certificate of Correction, and the Board denied that request with instruction that a motion to amend the claims would be the appropriate vehicle for addressing the dependency issue. Order, 3, Appx1203.

Securus filed the Motion to Amend, which the Board denied on two bases. Dec., 33-34, Appx0033-0034. The Board found that Securus did not establish that the proposed amendment was made in response to a ground of unpatentability involved in the IPR, and that Securus did not establish that the original disclosure supported the proposed claims. *Id.* at 34. Neither conclusion is correct.

### 1.    The Proposed Amendments Responded to a Ground of Unpatentability

GTL argued that each of claims 15 and 17-19 were obvious in view of Brown, that claim 16 was also obvious in view of Brown and Hodge, and that claim 20 was obvious in view of Brown and Crites. Pet., 3-4, Appx0045-0046. Securus responded that the proposed amended claims in its Motion to Amend clarified that the requirements of claim 14—to which the proposed amendments should properly depend—were not present in the references. In particular, Securus argued that claims 15-19 were patentable because the references did not disclose that "said information associated with said monitored one of said communications between individuals" (as recited by each of claims 15-19) is provided to the user by the "data interface"

required by Claim 14.    PO Resp., 21-23, 25-26, 28, and 31, Appx1227-1229, Appx1231-1232, Appx1234, and Appx1237; PO Reply to Mot. to Amend, 2-4, Appx1754-1756. Securus similarly explained that the prior art failed to disclose a "data interface compris[ing] an interactive web page" as required by claim 20, which also meets the limitations of claim 14. PO Reply to Mot. to Amend, 2-4, Appx1754-1756.

The Board found that claims 15-20 were obvious without considering whether the prior art references disclosed the limitations of claim 14. Dec., 22-23, 32, Appx0022-0023, Appx0032. The Board's decision to deny the Motion to Amend and find that claims 15-20 are obvious was based in part on a clear typographical error in Securus' Motion to Amend. Dec., 34, Appx0034. In its Motion to Amend, Securus correctly cited to 37 C.F.R. § 42.121 (a)(2)(ii), which instructs that a motion to amend can be denied where "the amendment does not respond to a ground of unpatentability involved in the trial." However, following that citation, Securus inadvertently stated that the "proposed correction is not made in response to a ground of unpatentability involved in the IPR." *See, e.g.*, Mot. to Amend, 10, Appx1554. In its Reply in support of the Motion to Amend, Securus stated unequivocally that the amendments did respond to a ground of unpatentability, and identified the typographical error in the Motion to Amend. PO Reply to Mot. to Amend, 3-4, Appx1755-1756. Securus also addressed this during the hearing. Record of Oral

31

Hearing, 34:3-14, Appx1811 ("We did cite to the correct provision of the rules and it was intended to say that they are in response to a ground of unpatentability. And that is evident by the fact that it clarifies that these limitations require a data interface.").

Notwithstanding, the Board ignored Securus' Reply and argument at the Oral Hearing, and relied upon the typographical error in Securus' Motion to Amend to deny the Motion to Amend. Dec., 34, Appx0034 ("Specifically, as Patent Owner notes multiple times in its Motion to Amend, the requested corrections 'are not made in response to a ground of unpatentability involved in the [*inter partes* review].'") Substantial evidence does not support this decision, as a reasonable mind would not accept such evidence to support it. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938). In addition to the fact that Securus consistently cited to the correct regulation, repeatedly explained that its statement in the Motion to Amend was inadvertent, Securus also affirmatively argued that GTL had not shown unpatentability of the proposed amended claims. Thus, Securus' substantive arguments demonstrated that, in fact, the proposed amendment was in response to a ground of unpatentability, and should have been granted.

### 2.     The Original Disclosure Supported the Proposed Amendments

The Board also ignored Securus' Reply with respect to Securus' demonstration that the proposed claims were supported by the original disclosure.

Securus demonstrated that the proposed amendments were supported by Figure 8 and paragraphs [0116]-[0125] of the original application to which the '222 patent claims priority. PO Reply to Mot. to Amend, 4-5, Appx1756-1757. Notwithstanding this showing, the Board did not consider the Reply in its Final Written Decision, but only considered Securus' Motion. Dec., 34, Appx0034 ("Patent Owner does not reference the original patent application once in its Motion to Amend, let alone provide citations that would demonstrate written description support for the proposed corrected claims.").

This disregard for the evidence Securus provided in its Reply did not allow "for a full and true disclosure of the facts," as required by 5 U.S.C. § 556(d), which entitles a party to an administrative proceeding "to submit rebuttal evidence . . . as may be required for a full and true disclosure of the facts." *Dell v. Acceleron, LLC*, 818 F.3d 1293, 1301 (Fed. Cir. 2016) (citing 5 U.S.C. § 556(d) and holding that the Board deprived a patent holder of its procedural rights). The Board did not consider, much less analyze, the portions that Securus argued support the proposed amendments. Thus, for this additional reason, the Board's denial of the Motion to Amend is not supported by substantial evidence and should be reversed.

## CONCLUSION AND REQUESTED RELIEF

Reversal of each of the Board's determinations of obviousness would dispose of the Board's grounds of rejection. Additionally, reversal of the Board's decision to deny the Motion to Amend would result in the appropriate correction to claims 15-20 and confirm the patentability of those amended claims over the prior art. As such, reversal is warranted.

For the foregoing reasons, Securus respectfully requests that this Court reverse the findings of the Patent Trial and Appeal Board and find claims 1-36 of the '222 patent patentable over the cited prior art.

Dated: August 19, 2016                    Respectfully submitted,

                                         */s/ Jeffrey Bragalone*
                                         Jeffrey R. Bragalone
                                         Justin B. Kimble
                                         Daniel F. Olejko
                                         Terry A. Saad
                                         BRAGALONE CONROY PC
                                         2200 Ross Ave., Suite 4500W
                                         Dallas, Texas 75201
                                         214-785-6670

                                         *Counsel for Appellant*
                                         *Securus Technologies, Inc.*

# ADDENDUM

Trials@uspto.gov                                    Paper No.  34
571.272.7822                                    Filed:  January 21, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
———————————

GLOBAL TEL*LINK CORPORATION,
Petitioner,

v.

SECURUS TECHNOLOGIES, INC.,
Patent Owner.
———————————

Case IPR2014-01278
Patent 7,860,222 B1
———————————

Before KEVIN F. TURNER, BARBARA A. BENOIT, and
GEORGIANNA W. BRADEN, *Administrative Patent Judges*.

BRADEN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318 and 37 C.F.R. § 42.73*

IPR2014-01278
Patent 7,860,222 B1

# I.     INTRODUCTION

We have jurisdiction to hear this *inter partes* review under 35 U.S.C.
§ 6(c), and this Final Written Decision is issued pursuant to 35 U.S.C.
§ 318(a) and 37 C.F.R. § 42.73.  For the reasons that follow, we determine
that Petitioner has shown by a preponderance of the evidence that claims 1–
36 of U.S. Patent No. 7,860,222 B1 (Ex. 1001, "the '222 patent") are
unpatentable.  We also determine that Patent Owner has not met its burden
on its Motion to Amend regarding entry of proposed substitute claims 15–
20, and thus, we deny the Motion to Amend.

## A.  Procedural History

Global Tel*Link Corporation ("Petitioner") filed a Petition (Paper 1,
"Pet.") to institute an *inter partes* review of claims 1–36 of the '222 patent
pursuant to 35 U.S.C. § 311.  Securus Technologies, Inc. ("Patent Owner")
filed a Preliminary Response (Paper 9, "Prelim. Resp.").  Pursuant to
35 U.S.C. § 314(a), we instituted an *inter partes* review of claims 1–36 as on
the following grounds:

| References | Basis | Claims Challenged |
|---|---|---|
| Brown[1] | § 103 | 1, 3, 7–10, 14–19, 21, and 31–36 |
| Brown and Gainsboro[2] | § 103 | 2, 11, 13, and 22–30 |
| Brown and Hong Kong[3] | § 103 | 4 |

---

[1] US Patent Publication No. 2004/0081296 A1, Apr. 29, 2004 (filed Oct. 23,
2002) (Ex. 1007).
[2] US Patent No. 6,064,963, May 16, 2000 (filed Dec. 17, 1997) (Ex. 1008).
[3] Human Rights Watch, *Hong Kong: Prison Conditions in 1997,* March 1,
1997, C905, Mar. 1, 1997 (Ex. 1009).

IPR2014-01278
Patent 7,860,222 B1

| References | Basis | Claims Challenged |
|---|---|---|
| Brown and Mow[4] | § 103 | 5 |
| Brown and Pettay[5] | § 103 | 6 |
| Brown, Gainsboro, and Johnson[6] | § 103 | 12 |
| Brown and Crites[7] | § 103 | 20 |
| Brown and Hodge[8] | § 103 | 7, 9, and 16 |

*See* Paper 12 ("Dec. to Inst."), 25.

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp."), to which Petitioner filed a Reply (Paper 24, "Reply").

In addition, Patent Owner also filed a Motion to Amend the Claims (Paper 21), to which Petitioner filed an Opposition (Paper 25). Patent Owner then filed a Reply to Petitioner's Opposition to the Motion to Amend the Claims. Paper 26.

An oral argument was held on October 27, 2015. A transcript of the oral argument is included in the record.[9] Paper 33, "Tr.".

---

[4] US Patent No. 6,668,045 B1, Dec. 23, 2003 (filed Oct. 30, 2000) (Ex. 1010).

[5] US Patent No. 7,191,133 B1, Mar. 13, 2007 (filed Feb. 15, 2001) (Ex. 1011).

[6] US Patent No. 6,141,406, Oct. 31, 2000 (filed May 30, 1997) (Ex. 1012).

[7] US Patent Publication No. 2003/0126470 A1, July 3, 2003 (filed Dec. 23, 2002) (Ex. 1013).

[8] US Patent Publication No. 2004/0029564 A1, Feb. 12, 2004 (filed Aug. 8, 2002) (Ex. 1014).

[9] The parties filed Objections to Demonstrative Exhibits. Papers 31, 32. In this Final Written Decision, we rely directly on the arguments presented

3

IPR2014-01278
Patent 7,860,222 B1

### B. Related Proceedings

Petitioner informs us that the '222 patent is the subject of district court case *Securus Technologies, Inc. v. Global Tel*Link Corporation,* 3:13-cv-03009 (N.D. Tex.).  Pet. 2.  Petitioner also informs us that the '222 patent is the subject of a petition for covered business method review, case CBM2014-00166, and of a concurrently-filed petition for *inter partes* review, case IPR2014-01282.  *Id.*; Related Matters (Paper 6).

### C. The '222 Patent

The '222 patent discloses systems and methods for providing "an electronic based capability to locate, collect, compile, aggregate, distil, and/or report robust data."  Ex. 1001, 3:2–4.  Essentially, the '222 patent relates to information technology ("IT") management and the collection of data from networks that span a wide range of institutions, including correctional facilities, without regard to which jurisdiction the source of data belongs.  *Id.* at 2:62–3:4.

One embodiment of the '222 patent provides an electronic-based capability to locate, collect, compile, aggregate, distil, and/or report robust data.  *Id.* at 3:2–4.  According to the '222 patent, data can be identified and harvested directly from the IT network, but the system also can spawn extended or indirect data identification, correlation, and/or harvesting of data, such as through recognizing crossing points or confluence of information aspects.  *Id.* at 3:4–9.  For example, an authorized person may

---

properly in the parties' briefs and the evidence of record.  The demonstrative exhibits were only considered to the extent they are consistent with those arguments and evidence; therefore, the objections are overruled.

IPR2014-01278
Patent 7,860,222 B1

perform a word search, e.g., using speech to text technology, across conversations provided via a plurality of call processing systems to identify a confluence or intersection of information beyond that possible with typical investigative tools. *Id*. at 3:35–40. An authorized person also may utilize such systems and methods to perform a national number search to look across a plurality of controlled environment facilities and determine if there are common telephone numbers (or other addresses, e.g., e-mail addresses, physical addresses, and the like) contacted by residents of different controlled environment facilities. *Id*. at 3:40–46.

In other embodiments of the '222 patent, an authorized user may have access to a phone call in real-time, so that in addition to having access to call recordings and call detail records, the authorized user may be able to monitor a live call. *Id*. at 3:56–61. An authorized person also may be able to listen to the call in progress, himself being muted from the call (such as to prevent the calling party and/or calling party being alerted to the monitoring by background noise associated with the investigator). *Id*. at 4:7–11. The authorized person may be provided various controls with respect to the monitored call, such as particular dual-tone multiple frequency ("DTMF") inputs to control switching from monitoring only (investigator muted) to barging into the call (investigator in duplex communication with one or more parties to the call), disconnecting the call between one or more of the parties to the call, marking positions in the call with "bookmarks" or tags for locating later in the call recording, and disconnecting the investigator from the call. *Id*. at 4:11–19. Various bookmarks may be defined by an investigator, such as by associating particular DTMF inputs with particular notations (e.g., threat, keyword, person of interest, investigator notation

IPR2014-01278
Patent 7,860,222 B1

appended, and the like). *Id*. at 4:19–23. In addition to such bookmarks, an authorized person is able to append investigator notations, such as voice and/or text notes, to a recorded monitored call. *Id*. at 4:23–25.

The authorized person is provided with a graphical user interface to review recorded monitored calls in order to visualize where bookmarks and/or notes are appended with respect to the monitored call. *Id*. at 4:26–30. According to the '222 patent, the graphical user interface, such as the one illustrated in Figure 8 below, can be a webpage with access to one or more databases. *Id*. at 30:34–52.



Figure 8 of the '222 patent shows an example of a graphical user interface that can be accessed by an authorized person**.**

### D. Illustrative Claims

As noted above, an *inter partes* review was instituted as to claims 1–36 of the '222 patent, of which claims 1 and 21 are the only independent claims. Claims 1 and 21 are illustrative of the challenged claims and are reproduced below (with paragraphing):

IPR2014-01278
Patent 7,860,222 B1

1. A system comprising:

a communication services module operable to provide communications between individuals; and

an investigative tools module in communication with said communication service module operable to allow a user to monitor said communications between individuals and to place event identifiers in association with said communications between individuals, said event identifiers comprise a plurality of bookmarks representing different events of interest; and

said investigative tools module comprises a word search module to identify particular words within said communications between individuals and place event identifiers in association therewith.

Ex. 1001, 34:8–21.

21. A method comprising:

providing communications between individuals;

recording said communications between individuals;

monitoring said communications between individuals, said monitoring comprises logic of a call processing system analyzing content of said communications between individuals; and

placing a plurality of event identifiers in association with a recorded one of said communications between individuals based upon events detected by said monitoring.

*Id.* at 35:26–35.

## II.    DISCUSSION

### A.  *Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1275–79 (Fed. Cir.

IPR2014-01278
Patent 7,860,222 B1

2015 ("Congress implicitly approved the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation.").  Under that standard, and absent any special definitions, we give claim terms their ordinary and customary meaning, as would be understood by one of ordinary skill in the art at the time of the invention.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

In the Decision to Institute, we construed "logic of a call processing system," which is recited in claim 21.  *See* Dec. to Inst. 8–10.  During the course of the trial, neither party challenged our construction of this claim term.  PO Resp. 5; Tr. 6:9–10.  We see no reason to alter the construction as set forth in the Decision to Institute, and we incorporate our previous analysis for purposes of this decision.  Therefore, for the reasons set forth in the Decision to Institute, we find the broadest reasonable construction of "logic of a call processing system" encompasses automated processes performed using logic elements and does not encompass processes performed solely by human action.

All other claim terms are given their plain and ordinary meaning.

B.  *Principles of Law*

To prevail in its challenges to the patentability of the claims, a petitioner must establish facts supporting its challenges by a preponderance of the evidence.  35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).  A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of

IPR2014-01278
Patent 7,860,222 B1

obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

We analyze the instituted grounds of unpatentability in accordance with the above-stated principles.

### C. Level of Ordinary Skill in the Art

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).

Petitioner's declarant, Dr. Kaza, opines that a person of ordinary skill in the art relevant to the '222 patent "would have a B.S. degree in Electrical Engineering, Computer Science, or an equivalent field as well as at least 3-5 years of academic or industry experience in telecommunications/information systems, or comparable industry experience." Ex. 1003 ¶ 19. Patent Owner does not offer any contrary explanation regarding who would qualify as a person of ordinary skill in the art relevant to the '222 patent (*see generally* PO Resp.) and Patent Owner's declarant, Dr. Akl uses the level of skill articulated by Dr. Kaza (Ex. 2002 ¶ 33).

Based on our review of the '222 patent, the types of problems and solutions described in the '222 patent and cited prior art, and the testimony of Petitioner's declarant, we adopt and apply Petitioner's definition of a

IPR2014-01278
Patent 7,860,222 B1

person of ordinary skill in the art at the time of the claimed invention.  We note that the applied prior art reflects the appropriate level of skill at the time of the claimed invention.  *See Okajima v. Bourdeau,* 261 F.3d 1350, 1355 (Fed. Cir. 2001).

> ### D. Asserted Obviousness of Claims 1, 3, 7–10, 14–19, 21, and 31–36 in View of Brown

Petitioner contends claims 1, 3, 7–10, 14–19, 21, and 31–36 of the '222 patent are unpatentable under 35 U.S.C. § 103 in view of Brown. Pet. 12–32.  Patent Owner disputes Petitioner's position, arguing Petitioner only provides attorney argument (PO Resp. 7) and that the cited reference fails to disclose all the elements required by the challenged claims (*id.* at 8–34).  We have reviewed the Petition, the Patent Owner's Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers.  For reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that the challenged claims of the '222 patent would have been obvious in view of Brown.

> ### 1. Overview of Brown

Brown discloses a personal telephone recording system that establishes a telephone conference between two or more users.  Ex. 1007 ¶¶ 2, 13.  The system records a telephone conference and can replay the recording after or during the telephone conference.  *Id.* ¶ 13.  The conference can be recorded in audio format, text format, or both.  *Id.* ¶ 14.  Figure 7A, reproduced below, illustrates one embodiment of the system taught in Brown.



In Figure 7A, a network based personal telephony recorder can provide proxy services to primary and secondary participants connected to the personal telephony recorder through the telephone network. *Id.* ¶ 102. The telephone network provides communication services between individuals, while the network based personal telephony recorder can call participants to join a conference call, or the participants can call into the personal telephony recorder to set up and join conference calls. *Id.* Another embodiment of the system taught in Brown is illustrated in Figure 16, reproduced below.

IPR2014-01278
Patent 7,860,222 B1



As shown in Figure 16, the personal telephony recorder can provide enhanced capabilities and recording for the user when communicating with participants (1675, 1680, and 1690) through telephone network 1670. *Id.* ¶ 143. Brown teaches that the personal telephony recorder system also includes voice-to-text converter 1630 for creating text version of call data 1640. *Id.* ¶ 144. The text version of the call data can be used for searching, reporting, and data mining. *Id.* According to Brown, post-call processing 1660 can be performed after a call has ended and includes functions for

searching call data for words and phrases and indexing words found in call data. *Id.* ¶ 146.

One processing feature specifically taught by Brown is the application and use of bookmarks. According to Brown, bookmarks are used to mark locations within call data, so that the identified call data can be retrieved expeditiously. *Id.* ¶¶ 85, 195. Brown explains that the personal telephony recorder user issues commands to add, delete, and modify bookmarks pertaining to either a live call between the user and the participants, or pertaining to a call stored in the call library. *Id.* ¶ 195. Figure 28, reproduced below, illustrates a system for setting and maintaining bookmarks corresponding to voice data.



As shown in Figure 28, command identifier 2820 receives commands from the system user, including bookmark commands. *Id.* The bookmark

IPR2014-01278
Patent 7,860,222 B1

commands are sent to bookmark processor 2825 to add, delete, and modify bookmarks. *Id.* Bookmark data for the calls are maintained in bookmark data area 2850. *Id.* Bookmarks are associated with a particular call, such as Call Data ID=A, so that the bookmarks are available after the call for querying, running reports, data mining, forwarding portions of the call (in voice or text format), and the like. *Id.* Nonvolatile storage is used to store voice data, bookmark data (marking places within the voice data), translation data (digital forms of the analog voice data), queries and command that have been requested, and data regarding participants of the calls, such as the participants' names, companies, telephone numbers, and the like. *Id.* ¶ 81; Fig. 2.

### 2. *Analysis*

#### a. *Independent Claim 1*

For claim 1, Petitioner contends that Brown discloses a personal telephony recorder system and method that provides communication between individuals, and the system includes a display device that displays, in near real-time fashion, voice data from call between individuals. Pet. 14–15 (citing Ex. 1007 ¶ 76; Fig. 2), 25–28. Petitioner then argues that the system described in Brown allows a user to monitor the communication between individuals because a user can "follow the conference call by reading the data displayed on the display device." Pet. 14–15 (citing Ex. 1007 ¶ 80).

Petitioner further contends that Brown teaches or suggests a "word search module" as recited by claim 1. Pet. 16–18; Reply 3–9. Petitioner argues that Brown discusses the use of a "[b]ookmarking component 345 [that] is used to allow the personal telephony recorder user the ability to set

14

bookmarks identifying where in a telephone call **a certain topic** was discussed." *Id*. at 16 (citing Ex. 1007 ¶ 85); *see also* Reply 7 ("Petition explicitly included the functionality of the bookmarking component 345 within Brown's 'word search module.'"). Petitioner then explains that Brown further discusses the "[p]rocessing of the recorded call data may involve, for example, creating an index, annotating the call data, etc. **Annotating the data** may involve searching the call data for **keywords and phrases**." Pet. 17 (citing Ex. 1007 ¶ 237). Petitioner argues that Brown's disclosure of "annotating" the location of "keywords and phrases" constitutes the identification of "particular words" and "events of interest" as recited in claims 1, which are performed by a "word search module." Reply 9–10. According to Petitioner, Brown describes all the functionality of the claimed "word search module," thus, rendering such a module obvious. Reply 4. Petitioner further argues that "Brown explicitly describes that its system functionality can be carried out within a module: '**One of the preferred implementations of the invention is an application**, namely a set of instructions (program code) in **a code module**.'" *Id.* at 5. Petitioner notes that in addition to (or in the alternative to) bookmarking data, Brown teaches that "[a]nnotating the data" constitutes the recited "place event identifiers in association therewith," while Brown's "keywords and phrases" constitutes the recited "particular words." Pet. 17; *see* Reply 8–9.

Petitioner also contends that Brown teaches or suggests a "word search module" as part of an "investigative tools module" as recited by claim 1. Pet. 15–18; Reply 7–8. According to Petitioner, Brown's Figure 2 illustrates that bookmarking component 345, data mining 385, word indexing 390, and querying 395 are all subcomponents of command

15

IPR2014-01278
Patent 7,860,222 B1

processing 340.  Reply 7–8.  Petitioner argues that command processing 340 is part of Brown's "investigative tools module" as shown, in part, in Brown's Figure 2.  Pet. 7–17; *see* Ex. 1007, 79–84, Figs. 2, 3.

Patent Owner disagrees with Petitioner's conclusion that Brown teaches or suggests the limitations of the challenged claims for several reasons.  PO Resp. 7–17.  First, Patent Owner asserts that Petitioner relies solely on attorney argument to support its challenges to patentability and does not cite to testimony from Petitioner's Declarant, Dr. Kaza, as evidence of obviousness.  According to Patent Owner, because Petitioner does not cite to Dr. Kaza's testimony, the "Board should not consider the testimony of Dr. Kaza in support of the Petition."  *Id.* at 7 (citing 37 C.F.R. § 42.6(a)).[10]

Second, Patent Owner contends Petitioner fails to identify a "word search module."  *Id.* at 8–10.  Patent Owner argues that Petitioner identifies various components in Brown that allegedly constitute a "word search module," but does not identify a specific "word search module" or explain in detail how the components "identify particular words within said communications between individuals," as required for the "word search module" by the claims.  *Id.* at 8.  Patent Owner further argues that the "word search module" performs the task to "identify particular words within said communications between individuals," and it must also "place event identifiers in association therewith."  *Id.* at 8–9 (citing Ex. 2002 ¶ 58).  According to Patent Owner, bookmarking component 345 is identified by

---

[10] Although Petitioner does not cite to specific portions of Dr. Kaza's testimony Petitioner timely filed the Declaration of Dr. Kaza and lists it as a supporting exhibit.  *See* Paper 4, 2; Ex. 1003.  We have considered the testimony and have accorded it the appropriate weigh.

IPR2014-01278
Patent 7,860,222 B1

Petitioner as the component that performs the task of "identify[ing] particular words" and "plac[ing] event identifier," but Petitioner never alleges that bookmarking component 345 is part of a word search module. *Id.* at 9.  Patent Owner also contends that Petitioner's obviousness challenge fails because Brown lacks the claimed "word search module" as recited in claim 1 and because Petitioner fails to allege that such a module would be obvious from the functionality described in Brown.  *Id.* at 14 (citing Ex. 2002 ¶ 60).

Third, Patent Owner contends Petitioner fails to identify an "investigative tools module" comprising a "word search module."  *Id.* at 10–14.  According to Patent Owner, the elements in Brown that Petitioner identifies as the "investigative tools module" are from a different embodiment than the elements Petitioner uses for the "word search module." *Id.* at 11.

Lastly, Patent Owner contends that Petitioner's obviousness challenge fails because Brown lacks the claimed "to place event identifiers" with "said event identifiers compris[ing] a plurality of bookmarks representing different events of interest" as recited in claim 1.  *Id.* at 14–17.  Patent Owner argues that claim 1 requires the identification of both "particular words" and "plac[ing] event identifier," but Petitioner relies on the same disclosure for both limitations.  *Id.* at 14.  According to Patent Owner, because the investigative tools module of claim 1 *comprises* the "word search module," one of ordinary skill in the art would understand the identification of particular words by the word search module to be a subset of a larger set of functionalities for placing event identifiers "representing different events of interest."  *Id.* at 15 (citing Ex. 2002 ¶ 61).  Patent Owner

17

IPR2014-01278
Patent 7,860,222 B1

then argues that by citing the same portion of Brown for both of these limitations, Petitioner has failed to establish that Brown discloses both the broader limitation (placing event identifiers "representing different events of interest") and the more specific limitation ("placing of 'event identifiers in association . . .' with identification of 'particular words.'"). *Id.*

We do not agree with Patent Owner's positions. Rather, we are persuaded by Petitioner's argument that the disclosure of Brown, as summarized above, teaches or suggests each limitation of the challenged claims. A challenge to patentability under 35 U.S.C. § 103 requires that all the claim limitations must be taught or suggested by the prior art as gauged in view of the creativity of an ordinarily skilled artisan. Brown specifically teaches a personal telephony recorder that "includes a number of components used to record call data and to provide services to users both during and after a telephone call." *See* Ex. 1007 ¶ 76. We also are persuaded by the testimony of Dr. Kaza who states that "[v]oice receiver 235, voice receiver 210, command filter 215, analog transmitter 220, and analogic transmitter 240 provide the recited '*communication services module operable to provide communications*' between the call participants." Ex. 1003 ¶ 50. Although a "module" as claimed may be understood to connote either hardware or software structure that performs a certain function, on the record before us, we are satisfied that one of skill in the art would have had reason to combine known elements for providing telephone calls, as taught in Brown, into a "module" to provide communications between individuals. *See KSR*, 550 U.S. at 420.

We also are persuaded by Petitioner's argument, as supported by the testimony of Dr. Kaza, that Brown describes or suggests an "investigative

IPR2014-01278
Patent 7,860,222 B1

tools module" that comprises a "word search module" as required in claim 1. *See* Pet. 16–17; Ex. 1003 ¶ 52. Specifically, we are persuaded that components of Brown's command processing component 340, including data mining component 385, word indexing component 390, bookmarking component 345, and querying component 395, constitute a "word search module," while Brown's voice receiver, command filter 215, voice-text converter 245, digital transmitter 285, email/computer system 282, and bookmarking component 345 collectively constitute an "investigative tools module." *See* Pet. 17; Reply 6–7. We further are persuaded that Brown separately teaches bookmarking data and annotating the data for word searches. *See* Pet. 17 (citing Ex. 1007 ¶ 237). Additionally, we are satisfied that a person of ordinary skill in the art would have understood bookmarking component 345, which is part of command processing component 340, to constitute a "word search module" that would be part of an "investigative tools module." Ex. 1003 ¶¶ 51–53. Therefore, based on the record before us, we are satisfied that Brown teaches or suggests an "investigative tools module" comprising a "word search module."

Furthermore, we are satisfied that Brown teaches both bookmarking and annotation of data for word searching, thereby meeting the limitations of (1) an investigative tools module that allows event identifiers, such as bookmarks, to be made identifying events of interests that occur during the communication between individuals, and (2) a word search module that identifies word in the communication between individuals and can place event identifiers at particular words.

IPR2014-01278
Patent 7,860,222 B1

Accordingly, we hold that Petitioner has shown by a preponderance of the evidence that claim 1 would have been obvious under 35 U.S.C. § 103 in view of Brown.

### b. Independent Claim 21

Petitioner contends Brown teaches or suggests the limitations of claim 21. Pet. 25–28. Specifically, Petitioner contends Brown discloses the ability to monitor and analyze the communications between individuals because Brown states that "[v]oice data . . . . can be displayed, in near real-time fashion" such that a user can follow the call by reading the data displayed on the display device. *Id.* at 27 (citing Ex. 1007 ¶ 80).

Patent Owner argues that Brown does not disclose "said monitoring comprises logic of a call processing system analyzing content of said communications between individuals," as required by independent claim 21. PO Resp. at 31–32. According to Patent Owner, Petitioner fails to identify any specific element that represents the "logic of a call processing system analyzing content of said communications between individuals." *Id.* Patent Owner further argues that "the mere following of a conference call does not necessitate any 'analyzing [of] content of said communications with individuals.'" *Id.* at 32. Patent Owner also notes that the Petition never alleges that this limitation would be obvious from the cited disclosure of Brown. *Id.*

Despite Patent Owner's arguments, we are persuaded by Petitioner's contention. As discussed above, we find that the broadest reasonable construction of "logic of a call processing system," for purposes of this decision, to encompass an automated process performed using logic elements. Brown discloses converting voice data to text data using a

20

converter and then displaying the converted text data. Ex. 1007 ¶ 80. The Declaration of Dr. Kaza supports Petitioner's position that Brown discloses "logic of a call processing system" as we have construed the term. Dr. Kaza testifies that Brown describes both (i) processing commands received during the call (Ex. 1007, Fig. 6, ¶ 98) and (ii) converting commands to text (*id.*, Fig. 32, ¶ 210), and (iii) searching call data for a particular word or phrase (*id.*, Fig. 32, ¶ 210). Ex. 1003 ¶ 84. Given this information, we are persuaded by Petitioner's proposition, as supported by Dr. Kaza's Declaration, that voice data converted to text data and displayed on a display device, as taught by Brown (*see* Pet. 27; Ex. 1007 ¶ 80), meet the limitation of "monitoring said communications between individuals, said monitoring comprises logic of a call processing system analyzing content of said communications between individuals," as required by claim 21.

Therefore, we are persuaded by Petitioner's argument that challenged claim 21 would have been obvious over Brown.

### c. Dependent Claims 3, 7–10, 14–19, and 31–36

With regard to dependent claims 3, 7–10, 14–19, and 31–36, Petitioner contends Brown teaches or suggests the limitations of each claim. Pet. 18–25, 28–32. Patent Owner specifically contests Petitioner's positions regarding claims 10, 15–19, and 32–36. PO Resp. 17–31, 33–34. We have considered all of Patent Owner's arguments, but for reasons set forth below we agree with Petitioner's positions.

Challenged claim 10 recites "wherein said investigative tools module further allows said user to control one or more aspects of said communications between individuals." Ex. 1001, 34:52–54. According to Patent Owner, the antecedent basis of "said user" is found in claim 1, but

IPR2014-01278
Patent 7,860,222 B1

Petitioner fails to identify a "user" disclosed by Brown that both "monitor[s] said communications between individuals" and "control[s] one or more aspects of said communications between individuals."  PO Resp. 17.  Patent Owner argues that a "participant" in Brown is different from and cannot be a "user" under the language in claim 10.  *Id.* at 18.  Patent Owner further argues that allowing or disallowing a requester to join a call is not controlling an aspect of the communication.  *Id.*  We do not agree with Patent Owner's position, because we do not read Brown to exclude the "personal telephony recorder user" from being a "participant."  Thus, we are persuaded by Petitioner that challenged claim 10 would have been obvious in view of Brown.

Similarly, dependent claim 16 requires "information associated with said monitored one of said communications between individuals comprises identification of at least one of said individuals" (Ex. 1001, 35:6–9), while claim 33 recites "information associated with said select one of said communications between individuals comprises identification of at least one of said individuals" (*id.* at 36:26–30).  Patent Owner contends that Brown does not disclose the identification of at least one of said individuals presented to the user as part of a data interface; rather Brown discloses email/computer system 282 that can display data, but does not disclose that the identification of at least one of said individuals is displayed thereon.  PO Resp. 22–23.  Brown, however, discloses that "whereupon the participant from whom the voice data was received is identified (step 445).  This identification can be based upon the line from which the data was received or may be made by analyzing the vocal characteristics of the participants

IPR2014-01278
Patent 7,860,222 B1

[sic] voice." *See* Ex 1007 ¶ 90. Thus, we are persuaded by Petitioner that challenged claims 16 and 33 would have been obvious in view of Brown.

After consideration of the language recited in claims 3, 7–10, 14–19, and 31–36 of the '222 patent, the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers, we find that one of ordinary skill in the art would have considered these dependent claims obvious over Brown. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 3, 7–10, 14–19, and 31–36 of the '222 patent are unpatentable under 35 U.S.C. § 103(a) in view of Brown.

E. *Asserted Obviousness of Claims 2, 11, 13, and 22–30 in View of Brown and Gainsboro*

Petitioner contends claims 2, 11, 13, and 22–30 of the '222 patent are unpatentable under 35 U.S.C. § 103 in view of Brown and Gainsboro. Pet. 32–41. Patent Owner disputes Petitioner's position, arguing that a person of ordinary skill in the art would not have had reason to combine the references in the manner proposed by Petitioner (PO Resp. 34–37) and further that the combination of the references fails to teach or suggest all of the claim limitations (*id.* at 37–41).

We have reviewed the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers. For reasons that follow, we determine Petitioner has shown by a preponderance of the evidence that claims 2, 11, 13, and 22–30 of the '222 patent are unpatentable as obvious over the combination of Brown and Gainsboro.

IPR2014-01278
Patent 7,860,222 B1

### 1. Overview of Brown

*See* Section II.D.1 discussed above.

### 2. Overview of Gainsboro

Gainsboro discloses a system for Automatic Speech Recognition (ASR) that identifies key words. Ex. 1008, Abstract. The system in Gainsboro is integrated with a telephone control system and recording system, specifically for correctional facilities. *Id*. at 1:6–9.

One embodiment in Gainsboro discloses a system that monitors live conversations and triggers an alert function when specific key words or phrases are used in a conversation. *Id*. at 4:17–26. Following the alert trigger, the system allows for termination of the call or for a correctional officer to be patched into the conversation. *Id*. at 4:26–30.

Another embodiment in Gainsboro discloses a system that monitors recorded conversations and scans the conversation for key words or phrases. *Id*. at 4:19–22. The system identifies the key words or phrases in the recording and logs their location for future playback. *Id*. at 4:31–35.

### 3. Analysis

#### a. Reason to Combine Prior Art References

Petitioner contends a person of ordinary skill in the art would have had reason to combine the teachings of Brown and Gainsboro because both are in the same field (telephone communications and recording services) and address the same problem –monitoring, control, and management of those communications. Pet. 34; *see* Ex. 1003 ¶ 100. Petitioner supports its position with the Declaration of Dr. Kaza, who testifies that a person of skill in the art would have combined the functions of Brown and Gainsboro by

IPR2014-01278
Patent 7,860,222 B1

known methods, thereby rendering the challenged claims obvious.  Ex. 1003 ¶ 102.

Patent Owner disputes Petitioner's position, arguing that a person of ordinary skill in the art would not have had reason to combine the references in the manner proposed by Petitioner.  PO Resp. 34–37.  First, Patent Owner argues that Dr. Kaza's conclusory opinions regarding the combination of Brown and Gainsboro should be given no probative weight because they are based on unsupported statements.  *Id.* at 35–36.  Second, Patent Owner argues that neither Dr. Kaza nor Petitioner even attempts to explain how the systems in Brown and Gainsboro could be combined, let alone that a person of ordinary skill in the art "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention."  *Id.*  Patent Owner relies on the Declaration of Dr. Alk to support its position.  Dr. Alk testifies as follows

> Brown merely discloses a system capable of converting speech to text that can be sent to a user, but no real-time monitoring of a conversation.  (Petition at 13)  And while Gainsboro discloses live monitoring of a conversation, no attempt is made by Petitioner to reconcile these significant differences in operation of the systems.  (Petition at 34).

Ex. 2002 ¶ 101.

We are not persuaded by Patent Owner's arguments, because they fail (1) to explain the differences between Brown and Gainsboro, (2) to rebut satisfactorily Petitioner's explanation of why a person of ordinary skill in the art would have combined the teachings of Brown and Gainsboro, and (3) to consider and rebut Petitioner's arguments regarding the collective teachings of Brown and Gainsboro from the perspective of one of ordinary skill in the

IPR2014-01278
Patent 7,860,222 B1

art. *See KSR*, 550 U.S. at 420 ("[F]amiliar items may have obvious uses beyond their primary purpose, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle."). To the contrary, we agree with Dr. Kaza, and find the fact that Brown and Gainsboro are in the same field (telephone communications and recording services) and address the same problem–control and management of those communications (*see* Ex. 1003 ¶ 100), weighs in favor of finding that a person of ordinary skill in the art would "fit the teachings" of Brown and Gainsboro together to render the challenged claims obvious. *See KSR*, 550 U.S. at 420 ("Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.").

Moreover, the test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference. *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) ("[T]he test for obviousness is what the combined teachings of the references would have suggested to those having ordinary skill in the art." (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981))). Rather, the test is what the combined teachings of those references would have suggested to those of ordinary skill in the art. *Id*.

*b. Analysis of Claims 2, 11, and 13*

Claim 2 depends from claim 1 and requires "a call processor providing communication services with respect to a controlled environment facility, and said user comprises an investigator." Petitioner contends that Gainsboro discloses the "corrections industry" as a "*controlled environment facility*" and "correctional officer" constitutes the recited "*investigator*."

IPR2014-01278
Patent 7,860,222 B1

Pet. 35 (citing Ex. 1008, 4:40–45). Claim 11 depends from claim 1 and requires "wherein said one or more aspects comprises termination of a monitored one of said communications between individuals." Petitioner contends that Gainsboro discloses an embodiment where phone conversations can be terminated in response to an alert from the system. Pet. 35–36 (citing Ex. 1008, 4:23–29). Claim 13 depends from claim 1 and requires "barging into a monitored one of said communications between individuals." Petitioner contends that Gainsboro discloses an embodiment that a correctional officer could be patched into the conversation in response to an alert from the system. *Id.*

Patent Owner does not provide contentions regarding additional limitations recited in dependent claims 2, 11, and 13. *See* generally PO Resp.*; see* 37 C.F.R. § 42.23(a).

After consideration of the language recited in claims 2, 11, and 13 of the '222 patent, the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers, we find that one of ordinary skill in the art would have considered these dependent claims obvious over Brown in view of Gainsboro. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 2, 11, and 13 of the '222 patent are unpatentable under 35 U.S.C. § 103(a).

### c. Analysis of Dependent Claims 22–30

Claims 22–30 depend from claim 21, and Petitioner contends that Brown and Gainsboro discloses embodiments that teach aspects of each dependent claim. Pet. 37–41. Patent Owner contends that Petitioner fails to

IPR2014-01278
Patent 7,860,222 B1

explain how Brown or Gainsboro teach the limitations of claims 22, 23, and 26.  PO Resp. 37–41.

After consideration of the language recited in claims 22–30 of the '222 patent, the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers, we find that one of ordinary skill in the art would have considered these dependent claims obvious over Brown in view of Gainsboro.  Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 22–30 of the '222 patent are unpatentable under 35 U.S.C. § 103(a).

### F.  Asserted Obviousness of Claim 4 in View of Brown and Hong Kong

Petitioner contends claim 4 of the '222 patent is unpatentable under 35 U.S.C. § 103 in view of Brown and Hong Kong.  Pet. 41–42.  Patent Owner disputes Petitioner's position, arguing that a person of ordinary skill in the art would not have had reason to combine the references in the manner proposed by Petitioner (PO Resp. 41– 43) and further that the combination of the references fails to teach or suggest all of the claim limitations (*id.* at 44–45).

We have reviewed the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers.  For reasons that follow, we determine Petitioner has shown by a preponderance of the evidence that claim 4 of the '222 patent is unpatentable as obvious over the combination of Brown and Hong Kong.

### 1.  Overview of Brown

*See* Section II.D.1 discussed above.

IPR2014-01278
Patent 7,860,222 B1

### 2.  Overview of Hong Kong

Hong Kong discloses information regarding prison conditions in Hong Kong prisons under Chinese rule.  Ex. 1009, 2.  Hong Kong discloses that "notices are prominently posted warning visitors that monitoring [of communications] occurs."  *Id.* at n115.  Hong Kong further states that "in at least one maximum security prison, conversations between certain prisoners and their visitors are recorded."  *Id.*

### 3.  Analysis

Petitioner contends that a person of ordinary skill in the art would have been motivated to combine Brown and Hong Kong because Brown describes monitoring telephone conference call services and Hong Kong describes monitoring of visitation calls with inmates.  Pet. 42 (citing Ex. 1003 ¶139).  According to Petitioner, substitution of one type of conversation (Brown's telephone call) with another type of conversation (Hong Kong's inmate visitation call) provides predictable results and, therefore, would have been obvious.  *Id.* (citing *KSR Int 'l Co. v. Teleflex Inc.,* 550 U.S. 398, 416 (2007)).  Therefore, Petitioner concludes that the combination of Brown and Hong Kong discloses "wherein said communications between individuals comprise controlled environment facility visitation calls."

Patent Owner, however, argues that Hong Kong is a report about prison conditions and is not a technical document that addresses telecommunications or monitoring of prison calls and, therefore, one of skill in the art would not look to Hong Kong for information and would not have combined it with Brown.  PO Resp. 44–45.  Patent Owner further argues that the combined references fail to teach "wherein said communications

IPR2014-01278
Patent 7,860,222 B1

between individuals comprise controlled environment facility visitation calls" as recited in claim 4. *Id.*

Despite Patent Owner's arguments, we agree with Petitioner that the combination of Brown and Hong Kong would have rendered the claims obvious. Although Hong Kong is not a technical document, it does demonstrate the state of the art and that prisons were monitoring and recording calls between inmates and visitors. Therefore, we are satisfied that a person of skill in the art would have combined the information in Brown and Hong Kong, thereby rendering the limitation "wherein said communications between individuals comprise controlled environment facility visitation calls" obvious.

Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 4 of the '222 patent is unpatentable under 35 U.S.C. § 103(a).

*G. Asserted Obviousness of Claim 5 in View of Brown and Mow*

Petitioner contends claim 5 of the '222 patent is unpatentable under 35 U.S.C. § 103 in view of Brown and Mow. Pet. 42–43. Patent Owner does not provide arguments disputing Petitioner's position. *See* 37 C.F.R. § 42.23(a).

After consideration of the language recited in claim 5 of the '222 patent, the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers, we find that one of ordinary skill in the art would have considered claim 5 obvious over Brown in view of Mow. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 5 of the '222 patent is unpatentable under 35 U.S.C. § 103(a).

IPR2014-01278
Patent 7,860,222 B1

*H. Asserted Obviousness of Claim 6 in View of Brown and Pettay*

Petitioner contends claim 6 of the '222 patent is unpatentable under 35 U.S.C. § 103 in view of Brown and Pettay. Pet. 43–45. Patent Owner disputes Petitioner's position, arguing that the combination of the references fails to teach or suggest all of the claim limitations. PO Resp. 45–46. Specifically, Patent Owner contends that the disclosure of video recording by Pettay does not constitute "video conferencing," because Pettay does not disclose that the video is transmitted or communicated. *Id.*

We do not agree with Patent Owner. Rather, we agree with Petitioner's position. Pet. 43–45. As discussed above, Brown establishes a telephone conference between two or more users (Ex. 1007 ¶¶ 2, 13), such that the extension to video conferencing would have been obvious. Accordingly, we determine Petitioner has shown by a preponderance of the evidence that claim 6 of the '222 patent is unpatentable as obvious over the combination of Brown and Pettay.

*I. Asserted Obviousness of Claim 12 in View of Brown, Gainsboro, and Johnson*

Petitioner contends claim 12 of the '222 patent is unpatentable under 35 U.S.C. § 103 in view of Brown, Gainsboro, and Johnson. Pet. 45–46. Patent Owner does not provide arguments disputing Petitioner's position. *See* 37 C.F.R. § 42.23(a).

After consideration of the language recited in claim 12 of the '222 patent, the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers, we find that one of ordinary skill in the art would have considered claim 12 obvious over Brown in view of Gainsboro and Johnson. Accordingly, we determine that

31

IPR2014-01278
Patent 7,860,222 B1

Petitioner has shown by a preponderance of the evidence that claim 12 of the '222 patent is unpatentable under 35 U.S.C. § 103(a).

### J.  Asserted Obviousness of Claim 20 in View of Brown and Crites

Petitioner contends claim 20 of the '222 patent is unpatentable under 35 U.S.C. § 103 in view of Brown and Crites.  Pet. 47.  Patent Owner does not provide arguments disputing Petitioner's position.  *See* 37 C.F.R. § 42.23(a).

After consideration of the language recited in claim 20 of the '222 patent, the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers, we find that one of ordinary skill in the art would have considered claim 20 obvious over Brown in view of Crites.  Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 20 of the '222 patent is unpatentable under 35 U.S.C. § 103(a).

### K.  Asserted Obviousness of Claims 7, 9, and 16 in View of Brown and Hodge

Petitioner contends claims 7, 9, and 16 of the '222 patent are unpatentable under 35 U.S.C. § 103 in view of Brown and Hodge.  Pet. 48–51.  Patent Owner disputes Petitioner's position with regards to claim 16, arguing that the combination of the references fails to teach or suggest all of the claim limitations.  PO Resp. 46–47.  According to Patent Owner, claim 16 requires the identification of at least one of said individuals to be part of the information presented to the user by a data interface, yet Petitioner does not explain how the prior art presents information by a data interface.  *Id.* The claim, however, does not require that identification be presented to a user by a data interface.  Moreover, Hodge specifically addresses a solution

32

IPR2014-01278
Patent 7,860,222 B1

of "an improved telephone call management system using improved identification means including biometric identification . . . [that] incorporates control means, monitoring means, recording means, and a reporting means for an institution based telecommunication network." *See* Ex. 1014 ¶ 42. Therefore, we agree with Petitioner's position and find that one of ordinary skill in the art would have considered claims 7, 9, and 16 obvious over Brown in view of Hodge.

Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 7, 9, and 16 of the '222 patent is unpatentable under 35 U.S.C. § 103(a).

## III.    MOTION TO AMEND

Patent Owner filed a Motion to Amend in order to correct the dependency of claims 15–20. Paper 21 ("Mot. to Amend"). According to Patent Owner, claims 15–20 depend from claim 1, but "it is clear from the claim language that they were intended to depend from claim 14." Mot. to Amend 2. In an *inter partes* review, amended claims are not added to a patent as of right, but rather must be proposed as a part of a Motion to Amend. 35 U.S.C. § 316(d). As the moving party, Patent Owner bears the burden of proof in establishing that it is entitled to add proposed substitute claims 15–20. 37 C.F.R. § 42.20(c). As part of this showing, Patent Owner must demonstrate (1) the amendment responds to a ground of unpatentability involved in the trial; (2) the amendment does not seek to enlarge the scope of the claims of the patent or introduce new subject matter; (3) the amendment proposes a reasonable number of substitute claims; and (4) the proposed claims are supported in the original disclosure. 37 C.F.R. § 42.121.

IPR2014-01278
Patent 7,860,222 B1

Upon review of the Motion to Amend, we are not persuaded that the requirements of 37 C.F.R. § 42.121 have been met.  Specifically, as Patent Owner notes multiple times in its Motion to Amend, the requested corrections "are not made in response to a ground of unpatentability involved in the [*inter partes* review]."  Mot. to Amend 2, 10, 12, 15, 17, 19, 22.  Rather, the correction is sought merely to correct the dependency of the claims to match the language of the claims as issued.  *Id.*  Although Patent Owner later argued that its Motion to Amend contains "an unfortunate typo that got carried throughout the Motion to Amend," (Tr. 34:3–5), the Patent Owner still failed to establish satisfactorily how a correction of claim dependency was in response to a ground of unpatentability involved in the trial (*see, e.g., id.* at 37:19–38:12).

Moreover, even if we were to accept Patent Owner's argument that the prior statement that "[t]h[e] proposed correction is not made in response to a ground of unpatentability involved in the [*inter partes* review]" was merely a typo or typos, Patent Owner does not establish the proposed claims are supported in the original disclosure.  In fact, Patent Owner does not reference the original patent application once in its Motion to Amend, let alone provide citations that would demonstrate written description support for the proposed corrected claims.

Accordingly, we determine that Patent Owner has not met its burden on its Motion to Amend regarding entry of proposed substitute claims 15–20, and thus, we deny the Motion to Amend.

IPR2014-01278
Patent 7,860,222 B1

## IV.    CONCLUSION

We conclude Petitioner has shown by a preponderance of the evidence that claims 1–36 of the '222 patent would have been obvious in view of the following prior art references:

1. Claims 1, 3, 7–10, 14–19, 21, and 31–36 under 35 U.S.C. § 103(a) as unpatentable over Brown;

2. Claims 2, 11, 13, and 22–30 under 35 U.S.C. § 103(a) as unpatentable over Brown and Gainsboro;

3. Claim 4 under 35 U.S.C. § 103(a) as unpatentable over Brown and Hong Kong;

4. Claim 5 under 35 U.S.C. § 103(a) as unpatentable over Brown and Mow;

5. Claim 6 under 35 U.S.C. § 103(a) as unpatentable over Brown and Pettay;

6. Claim 12 under 35 U.S.C. § 103(a) as unpatentable over Brown, Gainsboro, and Johnson;

7. Claim 20 under 35 U.S.C. § 103(a) as unpatentable over Brown and Crites; and

8. Claims 7, 9, and 16 under 35 U.S.C. § 103(a) as unpatentable over Brown and Hodge.

In addition, we conclude Patent Owner has not demonstrated, by a preponderance of the evidence, that the Motion to Amend meets the requirements set forth in 37 C.F.R. § 42.121.

## V.    ORDER

For the reasons given, it is

ORDERED that, by a preponderance of the evidence, claims 1–36 of the '222 patent are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Amend is *denied*; and

IPR2014-01278
Patent 7,860,222 B1

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-01278
Patent 7,860,222 B1

FOR PETITIONER:

Michael Specht
Michael Ray
Ross Hicks
Daniel Yonan
Lauren Schleh
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
Mspecht-PTAB@skgf.com
mray-PTAB@skgf.com
rhicks-PTAB@skgf.com
dyonan-PTAB@skgf.com
lschleh-PTAB@skgf.com


FOR PATENT OWNER:

Justin Kimble
BRAGALONE CONROY P.C.
jkimble@bcpc-law.com

37



US007860222B1

(12) **United States Patent**
  Sidler et al.

(10) **Patent No.:**      **US 7,860,222 B1**
(45) **Date of Patent:**         **Dec. 28, 2010**

(54) **SYSTEMS AND METHODS FOR ACQUIRING, ACCESSING, AND ANALYZING INVESTIGATIVE INFORMATION**

(75) Inventors: **James S. Sidler**, Lubbock, TX (US); **John J. Viola**, Frisco, TX (US); **Michelle L. Polozola**, Richardson, TX (US)

(73) Assignee: **Securus Technologies, Inc.**, Dallas, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1214 days.

(21) Appl. No.: **11/479,990**

(22) Filed: **Jun. 30, 2006**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/182,625, filed on Jul. 15, 2005, which is a continuation-in-part of application No. 10/720,848, filed on Nov. 24, 2003, now abandoned.

(51) **Int. Cl.**

| | |
|---|---|
| *H04M 1/24* | (2006.01) |
| *H04M 3/08* | (2006.01) |
| *H04M 3/22* | (2006.01) |
| *H04M 1/64* | (2006.01) |
| *H04M 3/00* | (2006.01) |
| *H04M 5/00* | (2006.01) |

(52) **U.S. Cl.** ................... **379/32.01**; 379/85; 379/266.1

(58) **Field of Classification Search** .................... 379/7, 379/32.01, 32.05, 35, 182, 184, 187, 188, 379/191, 194, 200, 68, 80, 85, 88.27, 266.1
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,185,781 A | 2/1993 | Huie | |
| 5,210,789 A | 5/1993 | Jeffus et al. | |
| 5,345,501 A | 9/1994 | Shelton | |
| 5,485,507 A | 1/1996 | Brown et al. | |
| 5,517,555 A | 5/1996 | Amadon et al. | |
| 5,627,887 A | 5/1997 | Freedman | |
| 5,655,013 A | 8/1997 | Gainsboro | |
| 5,832,068 A | 11/1998 | Smith | |
| 5,861,810 A | 1/1999 | Nguyen | |
| 5,915,001 A | 6/1999 | Uppaluru | |
| 5,926,533 A | 7/1999 | Gainsboro | |
| 5,937,035 A | * 8/1999 | Andruska et al. | ........ 379/32.03 |
| 5,991,373 A | * 11/1999 | Pattison et al. | ........... 379/93.17 |
| 6,038,315 A | 3/2000 | Strait et al. | |
| 6,058,163 A | * 5/2000 | Pattison et al. | ......... 379/265.06 |
| 6,072,860 A | 6/2000 | Kek et al. | |
| 6,118,860 A | 9/2000 | Hillson et al. | |
| 6,173,284 B1 | 1/2001 | Brown | |
| 6,175,831 B1 | 1/2001 | Weinreich et al. | |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 10/135,883, Falcone et al.

(Continued)

*Primary Examiner*—Binh K Tieu
(74) *Attorney, Agent, or Firm*—Fogarty, L.L.C.

(57) **ABSTRACT**

Disclosed are systems and methods which provide availability of information on a network wide basis, with the network or information technology (IT) fabric spanning a wide range of institutions and other sources of information, including correctional facilities, without regard to which jurisdiction the source of information belongs, e.g. police, courts, federal investigation agencies, public databases etcetera. Embodiments provide an electronic based capability to identify useful information and for locating, collecting, compiling, aggregating, distilling, and/or reporting robust data.

**36 Claims, 9 Drawing Sheets**



GTL 1001
IPR of U.S. Patent 7,860,222

US 7,860,222 B1

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,308,171 | B1 | 10/2001 | De La Huerga |
| 6,636,591 | B1 | 10/2003 | Swope et al. |
| 6,639,977 | B1 | 10/2003 | Swope et al. |
| 6,639,978 | B2 | 10/2003 | Draizin et al. |
| 6,665,376 | B1 | 12/2003 | Brown |
| 6,668,045 | B1 * | 12/2003 | Mow ........................ 379/88.19 |
| 6,688,518 | B1 | 2/2004 | Valencia et al. |
| 6,782,370 | B1 | 8/2004 | Stack |
| 6,920,209 | B1 | 7/2005 | Gainsboro |
| 6,947,525 | B2 * | 9/2005 | Benco ......................... 379/35 |
| 7,039,171 | B2 | 5/2006 | Gickler |
| 7,075,919 | B1 | 7/2006 | Wendt et al. |
| 7,079,636 | B1 | 7/2006 | McNitt et al. |
| 7,079,637 | B1 * | 7/2006 | McNitt et al. ............... 379/189 |
| 7,106,843 | B1 | 9/2006 | Gainsboro et al. |
| 7,133,845 | B1 | 11/2006 | Ginter et al. |
| 7,466,816 | B2 * | 12/2008 | Blair ........................ 379/266.1 |
| 7,529,357 | B1 * | 5/2009 | Rae et al. ................... 379/189 |
| 2001/0036821 | A1 | 11/2001 | Gainsboro et al. |
| 2001/0043697 | A1 | 11/2001 | Cox et al. |
| 2002/0046057 | A1 | 4/2002 | Ross |
| 2002/0067272 | A1 | 6/2002 | Lemelson et al. |
| 2002/0069084 | A1 | 6/2002 | Donovan |
| 2002/0107871 | A1 | 8/2002 | Wyzga et al. |
| 2002/0147707 | A1 | 10/2002 | Kraay et al. |
| 2003/0002639 | A1 | 1/2003 | Huie |
| 2003/0023874 | A1 | 1/2003 | Prokupets et al. |
| 2003/0070076 | A1 | 4/2003 | Michael |
| 2003/0093533 | A1 | 5/2003 | Ezerzer et al. |
| 2003/0099337 | A1 | 5/2003 | Lord |
| 2003/0126470 | A1 | 7/2003 | Crites et al. |
| 2003/0174826 | A1 * | 9/2003 | Hesse ..................... 379/210.01 |
| 2003/0190045 | A1 | 10/2003 | Huberman et al. |
| 2004/0161086 | A1 * | 8/2004 | Buntin et al. ............... 379/189 |
| 2005/0027723 | A1 * | 2/2005 | Jones et al. ................. 707/100 |
| 2005/0170818 | A1 * | 8/2005 | Netanel et al. ............. 455/415 |
| 2007/0041545 | A1 * | 2/2007 | Gainsboro .................. 379/188 |

OTHER PUBLICATIONS

i2 Investigative Analysis Software; "i2 TextChart—Text Visualized", URL: http://www.i2.co.uk/Products/i2TextChart/. Jun. 13, 2005.
i2 Investigative Analysis Software; "iBase-Information Captured", URL: http://www.i2.co.uk/Products/iBase/. Jun. 13, 2005.
i2 Investigative Analysis Software; "iBridge", URL: http://www.i2.co.uk/Products/iBridge/. Jun. 13, 2005.

i2 Investigative Analysis Software; "Chart Reader", URL: http://www.i2.co.uk/Products/Chart Reader. Jun. 13, 2005.
i2 Investigative Analysis Software; "Pattern Tracer", URL: http://www.i2.co.uk/Products/Pattern_Tracer/. Jun. 13, 2005.
i2 Investigative Analysis Software; "Prisons", URL: http://www.i2.co.uk/Solutions/Prisons/default.asp. Jun. 13, 2005.
i2 Investigative Analysis Software; "Setting International Standards for Investigative Analysis", URL: http://www.i2.co.uk/Products/index.htm. Jun. 13, 2005.
Microsoft White Paper: "Integrated Justice Information Systems", retrieved from Microsoft Justice & Public Safety Solutions (Nov. 5, 2002) [http://jps.directtaps.net/__vti_bin/owssvr.dll?Using=Default%2ehtm] 22 pages.
Imagis Technologies, Inc. "Computer Arrest and Booking System", [retrieved from http://www.imagistechnologies.com/Product/CABS.htm] (Nov. 5, 2002) 5 pages.
Imagis Technologies, Inc. "Integrated Justice System—Web-based Image and Data Sharing" [retrieved from <http://www.imagistechnologies.com/Product/IJISFramework.htm>] (Nov. 5, 2002) 4 pages.
O'Harrow, Robert Jr.. "U.S. Backs Florida's New Counterterrorism Database; 'Matrix' Offers Law Agencies Faster Access to Americans' Personal Records"; The Washington Post. Washington, D.C.: Aug. 6,2003. p. A. 01.
O'Harrow, Robert Jr.. "Database will make tracking suspected terrorists easier", The Dallas Morning News. Dallas, TX: Aug. 6, 2003. p. 7A.
Article entitled "Coplink: A Case of Intelligent Analysis and Knowledge Management," by Hauck et al., published in 1999. The subject matter disclosed therein is pertinent to that of claims 1-54 (e.g., methods of monitor inmate communications in a correctional facility using a database).
Article entitled "Building An Infrastructure for Law Enforcement Information Sharing and Collaboration: Design Issues and Challenges," by Chau et al., published in 2001.
Dye, Charles, "Oracle Distributed Systems," O'Reilly Media, Inc., Apr. 1, 1999.
McCollum, "Federal Prisoner Health Care Copayment Act of 2000," House of Representatives Report 106-851, 106th Congress 2d Session, Sep. 14, 2000.
Fischer, Alan D., "COPLINK nabs criminals faster," Arizona Daily Star, Jan. 7, 2001.
Wilkinson, Reginald A., "Visting in Prison," Prison and Jail Administration's Practices and Theory, 1999.

* cited by examiner

*FIG. 1*



*FIG. 3*

*FIG. 2*



Appx0104



*FIG. 4*

Appx0105



FIG. 5A

251
DIAGNOSTICS SENTINEL
227
FUTURE
226
INVESTIGATIVE TOOLS
531
FUTURE
530
TELE MEDICINE
529
VIDEO VISITATION
528
VIDEO ARRAIGNMENT
527
FUTURE
526
PROFESSIONAL SERVICES
224
COMPUTER AIDED DISPATCH (CAD)
223
RECORDS MANAGEMENT SYSTEM (DMS)
525
DETAINEE MANAGEMENT SYSTEM (DMS)
524
FUTURE
523
VISITATION AND ADMINISTRATION PHONES
522
WORD SEARCH
521
DETAINEE CALLING (INCLUDES ALTERNATIVE CALLING)
EXTERNAL WEB MANAGEMENT (WEBSITE, E-MAIL, INTERNET)
241
INFORMATION PORTAL
INTELLIGENT VIDEO MANAGER (IVR)
JUSTICE APPLICATION MANAGER (JAM)
CALL APPLICATION MANAGER (CAM)
225
231
CAMCONNECT
222
221
VOICE, DATA, VIDEO, INTEGRATION, NETWORKING
CUSTOMER SUPPORT (OPS, C-SAT)
NETWORK MANAGEMENT
VOICE
DATA
VIDEO

*FIG. 5B*





*FIG. 6A*

Appx0108

*FIG. 6B*





*FIG.7*

EVERCOM                    INVESTIGATIVE ASSISTANT™

HOME
DASHBOARD                  INVESTIGATOR PORTAL

710

REAL-TIME MONITORING
REAL-TIME CALL RECORDING
REMOTE CALL SURVEILLANCE
DETAILED CALL LOG
REMOTE CALL CONFERENCING
CALL TRACKER - CASE NOTE GENERATOR
VISITATION PHONE MONITORING
INVESTINGATIONS CASE FILE GENERATOR
INVESTIGATIVE REPORTS
INMATE ALERTS
MUG SHOT LINEUP
INMATE ARREST HISTORY
CD REPORTS - AUDIO/DATA RECORDING
RESTRICTED REPORTS
CALL DETAIL REPORTS
NATIONAL DATABASE SEARCH
INTER-AGENCY ASSISTANT ACCESS
INMATE ASSISTANT (VISITATION) ACCESS

720
FREQUENTLY CALLED NUMBERS
CENTRAL CONTACT NUMBER
CALL PLAYBACK HISTORY
INTERSTATE REPORT
CENTRALIZED FACILITY REPORT
INMATE DOSSIER REPORT
NATIONAL DATABASE REPORT

730
ALIASES
GANG MANAGEMENT
VISITOR ALERTS

740
FREQUENTLY CALLED NUMBER SEARCH
INMATE SEARCH
INTERAGENCY FACILITIES

760
AGENCY 1
AGENCY 2

750
VISITATION PHONE MONITORING
VISITOR BACKGROUND CHECK
VISITATION LOGS
INMATE VISITATION SEARCHES

770
INMATE NAME
INMATE BOOKING NUMBER

700

Appx0110



*FIG.8*

800
EVERCOM
INVESTIGATIVE ASSISTANT ™
REAL-TIME MONITORING
INVESTIGATOR PORTAL
820
CALL INFORMATION
CALLING PARTY: JOHN DOE (INMATE)
CALLING PARTY: MARY DOE (WIFE)
CALLING PARTY: 972-555-1111
810
812
811
DOSSIER
BACKGROUND CHECK
RELATED CALLS
CALL CONTROL
# COMMUNICATE WITH CALLING PARTY
* COMMUNICATE WITH CALLING AND CALLED PARTIES
1 THREAT BOOKMARK
2 KEYWORD BOOKMARK
3 PERSON OF INTEREST BOOKMARK
4 COMMENT BEGIN/END
821
822
830
832
833
832
834
835
836
KEYWORD
837
KEYWORD
838
831
839
PERSON OF INTEREST

US 7,860,222 B1

1

## SYSTEMS AND METHODS FOR ACQUIRING, ACCESSING, AND ANALYZING INVESTIGATIVE INFORMATION

### CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation-in-part of U.S. patent application Ser. No. 11/182,625, filed Jul. 15, 2005, entitled "Systems and Methods for Acquiring, Accessing, and Analyzing Investigative Information," which itself is a continuation-in-part of U.S. patent application Ser. No. 10/720, 848, filed Nov. 24, 2003, entitled "Information Management and Movement System and Method," which itself is a continuation-in-part of U.S. patent application Ser. No. 10/135, 878, filed Apr. 29, 2002, entitled "Information Management and Movement System and Method," to which priority is hereby claimed and which are hereby incorporated by reference herein. The present application is related to co-pending and commonly assigned U.S. patent application Ser. No. 10/720,732 entitled "Information Management and Movement System and Method," Ser. No. 09/640,831 entitled "System and Method for Reverse Billing of a Telephone Call," Ser. No. 09/640,999 entitled "System and Method for Affecting Inmate Conduct With Good Behavior Discount Telephone Rates," Ser. No. 09/995,253 entitled "Method and Apparatus for Exchanging Data Between A Primary Computer System And An External Computer System To Ensure Transactional Reconciliation Between The Systems," Ser. No. 10/022,946 entitled "Method for Determining an Entity Responsible for Billing a Called Party," Ser. No. 10/252,956 entitled "Three-Way Telephone Call Prevention System and Method," Ser. No. 10/135,883 entitled "Optimizing Profitability in Business Transactions," Ser. No. 10/642,532 entitled "Centralized Call Processing," Ser. No. 10/800,473 entitled "Call Processing with Voice Over Internet Protocol Transmission," and Ser. No. 10/701,549 entitled "Systems and Methods for Cross-Hatching Biometrics With Other Identifying Data." All of the above identified applications are hereby incorporated by reference herein.

### TECHNICAL FIELD

The present invention relates generally to information systems and, more particularly, to the acquisition, access, and/or analysis of investigative information.

### BACKGROUND OF THE INVENTION

Information management is becoming an increasingly critical key to the effective management of institutions and commercial enterprises. The information may relate to services, products, facilities, consumers, or staff, but it needs to be managed, moved, and accessed effectively if use of resources is to be optimized and/or profits are to be maximized.

The information needed to effectively and efficiently manage and operate a controlled environment, such as an inmate facility, may reflect the unique requirements of such a facility. There is often a need to facilitate both management of, and access to, various data with respect to a facility on a continuing basis. However, automation of management of and access to information pertaining to controlled environment facilities, and the residents therein, has been limited and integration of various different management functions has been even less prevalent.

2

For example, controlled environment facilities often do not have a ready means by which a new resident may be entered into (or reactivated in) a controlled environment facility management system, if such a system should happen to be in use at the facility. A police department, for example, may arrest an individual and bring that individual to a county facility for incarceration. However, entry of the individual into the controlled environment facility management system may require appreciable time, such as on the order of days. Accordingly, an investigator or other personnel may have no ability to monitor phones calls or access information regarding that individual when they are initially checked into the facility.

Moreover, there has been little, if any, interaction with respect to access of information pertaining to personal records of those confined to certain facilities. For example, due to the number and variety of systems and other sources of data used with respect to controlled environment facilities, investigators are often unable to effectively acquire, access, and analyze investigative information. An investigator may need to access a controlled environment facility management system, a gang database, a fingerprint database (e.g., an Identex machine), a public database (e.g., PublicData.com and RapSheets.com), and/or a plurality of other separate sources of information available to the investigator in order to complete a dossier or "investigative jacket" on an individual or case. The investigator may have unique user identification and passwords to access each such separate source of information, making it inconvenient and inefficient for the investigator to access desired or useful information. Moreover, the information available from these sources of information must typically be aggregated manually by the investigator. Additional useful information may exist, such as within the controlled environment facility management system of a different controlled environment facility, which the investigator is not able to access. Accordingly, useful and perhaps critical information may elude the investigator.

The problems discussed herein are compounded when Federal, State, and municipal jurisdictions are considered. For example, it is difficult, at best, for personnel at a Federal prison facility to easily obtain information on an individual's activities with respect to misdemeanors involving a local municipality. To obtain such information, a user would have to contact the local police department as well as the local court system and perhaps even the local probation department. When domestic situations occur, or when minors are involved, the problem is even more compounded in that Family Services and/or Juvenile Services might also be involved.

Currently, technology that has been deployed uses client server technology in which applications specific to one facility, or to one function within a facility, are designed. This type of system is an isolated point of technology, and solves only one isolated issue for a limited number of users. It is desired to share information on a technology level and to allow the approximately 50,000 desktop computers which now exist to access, on a controlled basis, that information without being constrained by the physical location of the computer and without being constrained by the enterprise affiliation of the computer.

### BRIEF SUMMARY OF THE INVENTION

In one embodiment, systems and methods of the present invention provide availability of information on a network wide basis, with the network or information technology (IT) fabric spanning a wide range of institutions and other sources of information, including correctional facilities, without regard to which jurisdiction the source of information

3

belongs, e.g. police, courts, federal investigation agencies, public databases etcetera. Embodiments of the invention provide an electronic based capability to locate, collect, compile, aggregate, distil, and/or report robust data. Preferred embodiments of the present invention not only directly identify and harvest data from the IT fabric, but also spawn extended or indirect data identification, correlation, and/or harvesting of data, such as through recognizing crossing points or confluence of information aspects.

Data located, collected, compiled, aggregated, distilled, and/or reported according to embodiments of the present invention may be utilized with respect to investigation (e.g., police investigation of crimes or suspects), credit decisions (e.g., decisions with respect to providing goods or services, such as calling service, in real-time), identification (e.g., to confirm the identity of a detainee), collection (e.g., identify parties who know an individual, to identify an individual's property, to perform skip-trace analysis, etcetera), decision making (e.g., determine if a medication should be administered), locating an individual (e.g., identifying parties who know an individual), commerce (e.g., determining a source of funding), payments (e.g., determining a proper entity to receive payment), and/or the like. For example, an investigator may utilize a system of an embodiment of the present invention to correlate information, perhaps available from a plurality of databases and/or various disparate systems (e.g., call recordings, call notes, inmate records, court records, etcetera), to compile or create an investigative jacket. Such an investigative jacket may be shared with, updated by, and/or edited by a plurality of investigators or other individuals. Accordingly, collaboration among investigators, even interagency collaboration, may be facilitated through the use of systems and methods of embodiments of the present invention.

An investigator may utilize systems and methods of embodiments of the invention to perform a word search, e.g., using speech to text technology, across conversations provided via a plurality of call processing systems to identify a confluence or intersection of information beyond that possible with typical investigative tools. Additionally or alternatively, an investigator may utilize such systems and methods to perform a national number search to look across a plurality of controlled environment facilities and determine if there are common telephone numbers (or other addresses, e.g., e-mail addresses, physical addresses, etcetera) contacted by residents of different controlled environment facilities. Likewise, an investigator may utilize such systems and methods of embodiments of the invention to perform a reverse lookup with respect to a telephone number (or other address, e.g., e-mail address, physical address, etcetera) a resident contacts, such as through the use of billing name and address attributes, account information, etcetera, and/or to perform background searches with respect to individuals contacted by a resident, such as to determine if the individual has a warrant outstanding, has a previous conviction, etcetera.

An investigator or other individual's access to calling or other information according to embodiments of the invention may be real-time (during the call) and/or after the call. For example, in addition to having access to call recordings and call detail records, an investigator may be allowed to monitor a live call and/or participate in the call. According to an embodiment of the invention, an investigator is able to "barge" into a call, such as to converse with one party to the call (e.g., the calling party or the called party) while blocking other parties to the call or to converse with multiple parties to the call. For example, embodiments of the present invention may monitor calls for one or more criteria (e.g., a particular

4

called number, a particular individual making or receiving a call, a particular calling feature such as three-way calling being invoked, a particular word or phrase spoken during the call) identified by an investigator to cause a notification to be communicated to the investigator to provide the investigator an opportunity listen in on the call and to barge into the call. An investigator may be enabled to listen to the call in progress, himself being muted from the call (such as to prevent the calling party and/or calling party being alerted to the monitoring by background noise associated with the investigator). The investigator may be provided various controls with respect to the monitored call, such as particular dual-tone multiple frequency (DTMF) inputs to control switching from monitoring only (investigator muted) to barging into the call (investigator in duplex communication with one or more parties to the call), disconnecting the call between one or more of the parties to the call, marking positions in the call with "bookmarks" or tags for locating later in the call recording, disconnect the investigator from the call, etcetera. Various bookmarks may be defined by an investigator, such as by associating particular DTMF inputs with particular notations (e.g., threat, keyword, person of interest, investigator notation appended, etcetera). In addition to or in the alternative to such bookmarks, an investigator is enabled to append investigator notations, such as voice and/or text notes, to a recorded monitored call according to embodiments of the invention. The investigator is preferably provided with a graphical user interface to review such recorded monitored calls in order to visualize where bookmarks and/or notes are appended with respect to the monitored call.

Systems and methods of embodiments of the invention provide location, collection, compilation, aggregation, distillation, and/or reporting of information heretofore unavailable or otherwise not readily available to investigators and other individuals. For example, embodiments of the invention provide access to visitation information, such as for approving a visitor, conducting a background check of a visitor, monitoring of visitation calls, etcetera. Additionally or alternatively, embodiments of the invention may facilitate acquisition of information, such as through implementing a "crime tip" or other information collection technique. For example, calling systems and/or user terminals of embodiments of the invention provide a robust interface allowing a user thereof to volunteer information, perhaps when using an information management and retrieval system for another primary purpose.

Information management and retrieval systems of the present invention may be deployed for use with respect to a variety of controlled environment facilities, including inmate facilities (e.g., municipal jails, county jails, state prisons, federal prisons, military stockades, juvenile facilities, and detention camps), hospitals, nursing homes, camps, and the like. For example, information management and retrieval systems of the present invention may be disposed within such a controlled environment facility, or disposed remotely thereto having operator (user) terminals disposed within each of the different facilities and/or external thereto, to provide information management, movement and access uniquely suited for use with respect to such an environment. Additionally, information management and retrieval systems of the present invention may be coupled to other systems, whether internal or external to the controlled environment facility, including networks (such as the public switched telephone network (PSTN) and the Internet), databases (such as demographic databases, consumer account databases, historical records databases, government databases, and judicial databases), and platforms (such as personal computers, computer net-

US 7,860,222 B1

5

works, and even other information management systems of the present invention). It should be appreciated, however, that aspects of the present invention are useful without regard to controlled environment facilities, and therefore there is no limitation to use of embodiments of the present invention with respect to controlled environment facilities.

A peer to peer arrangement may be used according to embodiments of the invention, such that all available information is assigned a security level and/or sharing group and then becomes accessible to anyone having the designated security level and/or sharing group designation. The security level could, if desired, be associated with a peer level. Also, the user could not only access the data specific to a particular file (for example, an individual), but could also access any associated data files or other databases recognized by the system as containing useful information, whether locally or remotely maintained. Additionally or alternatively, a net-centric or centralized arrangement, such as where centralized servers and/or databases are shared among a number of facilities, agencies, etcetera, may be utilized according to embodiments of the invention. The foregoing security levels may be implemented with respect to data stored or otherwise managed by such centralized systems to control access to data specific to a particular file (for example, an individual) or other facilities, agencies, etcetera which is recognized by the system as containing useful information.

These "additional" files, could be manually populated data files or could be associative files which track particular transactions or other information associated with a particular file, such as a file of who an individual represented by a selected file has called within the last month, or year, or the "additional" file could be a list of relatives, or a list of goods purchased, some, or all, of these lists could be maintained in databases located remote both from the user and from the target database and may be compiled and/or updated automatically, such as through operation of information management systems of the present invention. The "additional" files may be identified using the aforementioned analysis techniques.

In a further embodiment, information management and retrieval systems of the present invention are used to facilitate information exchange and interaction among individuals and agencies. For example, chat rooms, bulletin boards and other features which allow users at various facilities within a community of interest to exchange concepts may be implemented according to embodiments of the invention.

One preferred embodiment utilizes an information management and retrieval system comprising intelligence/management functionality and transaction/commerce functionality to provide interoperability across a variety of controlled environment functions. For example, a preferred embodiment provides interoperability of such facility management functions as facility administration, record management, dispatching of personnel, to efficiently utilize resources as well as to provide seamless movement and availability of data throughout these functional aspects. Additionally, functionality unique to the particular controlled environment facility, such as video arraignment, video visitation, investigation, and the like, may be provided interoperability according to the present invention. Preferably, transaction and commerce functionality, such as marketing of goods and services to residents or individuals having an interest in the residents, ordering of goods and services by residents or individuals having an interest in the residents, sales of goods and services by vendors, and payment for goods and services through prepaid and postpaid techniques, with account establishment

6

and debit/credit functionality, is provided interoperability with management functions, or aspects thereof, according to the present invention.

Preferred embodiment information management systems and methods provide connectivity and functionality both within the controlled environment facility and outside the controlled environment facility, such as through the use of an information portal providing real-time information communication through a variety of media and according to various protocols. For example, management, staff, and residents within the controlled environment facility may be provided interfaces for accessing particular functional aspects available to the individual. Likewise, individuals and/or commercial enterprises having some interest in the controlled environment facility, or the residents thereof, may be provided interfaces for accessing particular functional aspects of the system. Such individuals and commercial enterprises may include friends and family of residents, vendors, government agencies (e.g., judicial officials, law enforcement officials, and other local, state, and federal agencies), providers of services to residents (e.g., doctors, clergymen, attorneys, bail bondsmen, and counselors), and individuals with a connection to the facility or its residents (e.g., voters in the county and victims of a crime committed by a resident).

The interfaces provided according to the present invention may be varied depending upon the individual given access and/or the functionality available to the individual. Accordingly, a manager may be given access to the information management system via computer systems (local and/or remote) personal digital assistants (PDAs), pagers, and telephones (wireline and/or wireless), to facilitate input of data, querying of data, notification of events or conditions, management of the facility, receiving reports, etcetera. However, a resident of the controlled environment facility may be given access to the information management system via a wireline telephone only, to thereby restrict the resident to making outbound calls (which may be restricted by operation of the information management system in time, duration, destination, content, etcetera) and/or the acquisition of particular goods available to residents. Similarly, vendors may be given access to the information management system via a remote computer system and/or telephone (wireline and/or wireless) to receive orders from the facility, verify accounts or status of payment, and coordinate delivery of goods and services.

Access to and/or collection of data by information management systems of the present invention may utilize biometrics, such as voice print, finger print, iris and/or retina scan, hand scan, face and/or personal physical attribute recognition, and the like. Accordingly, one or more of the above identified user terminal devices may be equipped with biometric interfaces for use in collection appropriate biometric data for use in verifying a user, collecting biometric data for storage by the information management system, for authorizing a transaction or transactions, etcetera.

Embodiments of the invention provide data access not only to facility administration and personnel, but also to persons disposed remotely, even in the field, such as police on the streets. In one embodiment, a web browser is used at any number of user locations to gain access, by the user, to data contained in databases maintained in association with any number of facilities or other sources of information, thereby providing anytime, anywhere access to robust data. Interactive "web pages" may be provided to a user via a web browser which conveniently provides access to a number of tools useful to particular users. For example, one embodiment provides an investigator "dashboard" configuration allowing users identified as investigators to access and view investiga-

7

tor tools. A browser interface utilized according to embodiments of the invention provides a user friendly front end which seamlessly presents relevant information to users, irrespective of the sources, systems, databases, or combinations thereof from which it is obtained. Preferably browser interfaces utilized according the present invention are multimedia capable to facilitate presentation of text data, e.g. inmate records, audio data, e.g., recordings of inmate phone calls, and video data, e.g., photographs and streaming video.

The foregoing has outlined rather broadly the features and technical advantages of the present invention in order that the detailed description of the invention that follows may be better understood. Additional features and advantages of the invention will be described hereinafter which form the subject of the claims of the invention. It should be appreciated that the conception and specific embodiment disclosed may be readily utilized as a basis for modifying or designing other structures for carrying out the same purposes of the present invention. It should also be realized that such equivalent constructions do not depart from the invention as set forth in the appended claims. The novel features which are believed to be characteristic of the invention, both as to its organization and method of operation, together with further objects and advantages will be better understood from the following description when considered in connection with the accompanying figures. It is to be expressly understood, however, that each of the figures is provided for the purpose of illustration and description only and is not intended as a definition of the limits of the present invention.

BRIEF DESCRIPTION OF THE DRAWING

For a more complete understanding of the present invention, reference is now made to the following descriptions taken in conjunction with the accompanying drawing, in which:

FIG. **1** shows a block diagram of a controlled environment information management system deployed according to a preferred embodiment of the present invention;

FIG. **2** shows a block diagram of an integrated controlled environment information management architecture according to a preferred embodiment of the present invention;

FIG. **3** shows a processor based system adapted to provide controlled environment information management according to an embodiment of the present invention;

FIG. **4** shows an illustration of the flow of information through a controlled environment information management system, such as that of FIGS. **1** and **2**, deployed with respect to an inmate facility;

FIG. **5**A shows a block diagram of an integrated controlled environment information management architecture adapted for use with respect to an inmate facility according to a preferred embodiment of the present invention;

FIG. **5**B shows a graphical representation of a data framework utilized according to an embodiment of an integrated controlled environment information management architecture of the present invention;

FIGS. **6**A and **6**B show illustrations of the flow of information over a network having data bases in diverse locations according to embodiments of the invention;

FIG. **7** shows an embodiment of a user interface presenting and facilitating selection of various investigative tools according to an embodiment of the invention; and

FIG. **8** shows an embodiment of a user interface used with respect to monitoring a call.

8

DETAILED DESCRIPTION OF THE INVENTION

Controlled environment facilities, such as inmate facilities, hospitals, nursing homes, and camps, may be thought of as a small community or city, perhaps walled or otherwise access restricted, wherein various activities occur within the community and between the community and those outside the community in the daily operation thereof. Such a community includes a number of individuals and enterprises directly associated therewith, including management, staff, and inmates, residents, patients, or guests (hereinafter referred to as residents), and a number of individuals and enterprises indirectly associated therewith, including friends and family of residents, vendors, government agencies, providers of services to residents, and individuals with a connection to the facility or its residents. Information is often exchanged and transactions are often conducted by, between, among, and on behalf of the aforementioned individuals and enterprises in performing the aforementioned daily activities.

It shall be appreciated that in such a controlled environment, there may be unique relationships, situations, and information which may be leveraged in providing management functions, in conducting transactions, or in locating, collecting, compiling, aggregating, distilling, and/or reporting information. For example, information flowing from residents may be monitored and/or processed in an intelligence area to ensure the safety and security of those within the controlled environment facility and those outside of the facility. Moreover, information with respect to individuals and/or enterprises having an interest in residents of the controlled environment facility may be utilized in facilitating transactions, such as toll telephone calls and the purchase of commissary items. Accordingly, preferred embodiments of the present invention provide integration of various functional aspects associated with a controlled environment facility to provide a robust information movement and management platform.

Directing attention to FIG. **1**, a controlled environment information management system of the present invention is shown according to an embodiment to provide integrated management and movement of information and transaction and commerce facilitation within and associated with a controlled environment facility. Specifically, controlled environment information management system **110** is deployed within controlled environment facility **100**. Although illustrated as being deployed within the controlled environment facility in FIG. **1**, it should be appreciated that controlled environment information management systems of the present invention may be deployed in a number of configurations. For example, embodiments of the present invention provide an information management system deployed external to the controlled environment facility and having data terminals and/or other access points deployed within the controlled environment facility, as shown and described in the above referenced patent applications entitled "Centralized Call Processing" and "Call Processing with Voice Over Internet Protocol Transmission." Additionally or alternatively, information management systems may be provided in a distributed topology, such as having server systems, application programs, and/or databases distributed throughout a number of geographic locals, according to embodiments of the present invention.

As shown in FIG. **1**, information management system **110** may provide a number of access points coupled to a variety of user terminal equipment configurations. User terminal equipment utilized according to preferred embodiments of the present invention may include personal computers, personal digital assistants (PDAs), pagers, telephones (wireline and

9

wireless), facsimile machines, kiosks, automatic teller machines (ATMs), and the like, coupled through direct links, such as wireline, cable, fiber optic, etcetera, and/or indirect links, such as network links, private branch exchange (PBX) links, etcetera. Accordingly, information management system 110 of the illustrated embodiment provides connectivity to user terminals 122-1 through 122-M disposed within controlled environment facility 100 via direct connections, user terminals 121-1 through 121-N disposed within controlled environment facility 100 via indirect connections (here comprising network or networks 120, referred to herein as network 120), and user terminals 131-1 through 131-P disposed external to controlled environment facility 100 via indirect connections (here comprising XML connections and/or network or networks 130, referred to herein as network 130).

Various ones of user terminal equipment utilized according to the present invention may be configured to include the ability to collect biometric data, such as through the use of fingerprint readers, hand scanners, cameras, microphones, iris and/or retina scanners, and/or the like. For example, a personal computer, PDA, and/or telephone terminal utilized according to the present invention may be equipped with a camera, whether still or moving image, to capture an image of a user's face or other physical attribute. It should be appreciated that the aforementioned camera (and similarly, microphones) utilized at various user terminals for collection of biometric data may itself not be uniquely adapted for biometric data processing and, therefore, may be readily available for use according to the present invention. However, systems of the present invention, whether user terminals or information management systems, preferably include adaptation such as computer program code, for collecting, processing, and/or storing biometric data as described herein. User terminals may additionally or alternatively be equipped with a more specialized form of biometric interface, such as a fingerprint reader or iris scanner, utilized exclusively for the collection of biometric data. Captured biometric data may be processed, such as described in the above referenced patent application entitled "Systems and Methods for Cross-Hatching Biometrics With Other Identifying Data," to verify the identity of the user, such as to allow access to data or services or to authorize a transaction, or the biometric data may be collected for storage by the information management system, such as to supplement a database entry associated with the user. It should be appreciated that collected biometric data may be processed locally by a user terminal, such as to verify the identity of a user for authorizing further interaction, or may be processed by the information management system, such as by receiving raw biometric data from a user terminal and providing processing thereof to supply a result code to the user terminal.

In accordance with the preferred embodiment of the present invention, controlled environment information management system 110 is adapted to include intelligence/management functionality 111 and transaction/commerce functionality 112. Preferably, intelligence/management functionality 111 provides for processing, collection, storage, and movement of information for managing various operational aspects of the controlled environment facility, including the management of personnel, residents, vendors, and resources. Transaction/commerce functionality 112 preferably provides for the instigation and completion of various transactions, including requesting and providing goods and services, determining credit worthiness, verifying account balance and status, and providing for payment. The aforementioned functionality is preferably provided according to the present invention at any distance and at any time.

10

Directing attention to FIG. 2, a preferred embodiment integrated architecture of a information management system of the present invention is shown. Specifically, information management system 110 is shown as including a plurality of vertical applications and modules useful therewith, including communication/transaction services 221, facility administration manager 222, record management system 223, computer aided dispatch 224, video arraignment/visitation 225, and investigative tools 226, providing features and functions for providing desired management and transactions. Each of these vertical applications and modules may provide features and functions desirable with respect to the controlled environment facility.

For example, communication/transaction services 221 may provide distance telephony, prepaid and postpaid toll calling services, telephonic commerce, account balance verification and refill, and credit worthiness determination as may be utilized by residents, friends and family thereof, and vendors. It should be appreciated that the communications and transactions facilitated by communication/transaction services 221 are not limited to any particular type or format of communications or transactions. For example, communication/transaction services 221 may facilitate voice and/or video communications, such as plain old telephone services (POTS), voice over Internet protocol (VoIP) communications, and multi-media communications, as well as other forms of communications, including e-mail, short message service (SMS), alpha-numeric paging, etcetera.

Facility administration manager 222 may provide management of residents from entry into the facility to release therefrom, management of facility staff and resources, and data querying and reporting. Embodiments of the present invention implement facility administration manager 222 to enter information associated with a resident of a facility and facility personnel into information management system 110. For example, upon admittance of a resident into a facility, facility administration manager 222 may be utilized to enter resident information, thereby establishing a record associated with the resident, creating a user account, issuing a user personal identification number (PIN), obtaining biometric samples, creating a list of permitted calling numbers/addresses, etcetera. Such information is preferably utilized to populate data fields/records associated with various vertical applications of information management system 110, thereby providing a unified point of entry for various systems and functions. For example, information communication may be provided by closely coupled vertical applications (e.g., using direct, perhaps proprietary, interfaces) and/or through the use of open architecture interfaces (e.g., using an extensible markup language (XML) to provide self describing, open system communications).

Information communication provided according to embodiments of the invention provides for transfer of data or automated population of appropriate data fields, where data associated with an individual is available to information management system 110. For example, a police department may utilize an associated information management system or a centralized information management system to book an individual into a municipal jail. That individual may later be transferred to a county or state facility, having an information management system associated therewith which is in communication with the police department's information management system or which is also using a centralized information management system. Accordingly, personnel at the country or state facility may not be required to input any or all the information associated with the individual.

**11**

The aforementioned creation of a user account and issuing a PIN is provided substantially immediately upon entry of the appropriate information according to embodiments of the invention to facilitate tracking of residents from the moment they are admitted to a facility. For example, upon booking of an individual into a municipal jail, a user account may be created and a PIN issued to the individual prior to them being placed in a detention cell. Thereafter, the individual may utilize the PIN in order to access transaction/commerce functionality **112** of information management system **110** in order to place a free phone call, such as to notify friends/family of their incarceration, to solicit legal assistance, etcetera. The ability to create a user account and issue a PIN as an individual is admitted into a facility provides heretofore unavailable opportunities to collect investigative information. For example, research has shown that calls made early in an individual's incarceration tend to be rich with investigative information, such as information on crimes committed, persons involved in the crimes, etcetera. Accordingly, such calls may be recorded, monitored, word searched, and/or the like to provide an investigator valuable information that might otherwise have been lost. Moreover, creating a user account and issue a PIN as an individual is admitted into a facility provides administrative advantages, such as limiting the number of free calls made by an individual and providing proof that an individual was provided with a free call as may be required by law.

Record management system **223** may provide storage, access, management, and/or maintenance of databases comprising information with respect to residents, staff, resources, and transactions. Computer aided dispatch may provide assignment, allocation, and/or dispatching of resources and personnel. Video arraignment/visitation **225** may provide multimedia communication, as may be useful in providing visitation by remote parties and/or making remote appearances by a resident.

Investigative tools **226** may provide collection, processing, analysis, and/or reporting of information for intelligence purposes. Investigation tools **226** of a preferred embodiment provides tools such as word search, call recording, call notification, call monitoring, call "barging," call control, visitation monitoring/background checking, crime tip conduit, multiple database querying, and resource integration as described herein. The foregoing investigative tools are preferably provided through an intuitive user interface, such as using a web page having menus comprising an investigator dashboard to present and facilitate selection of various investigative tools as described herein.

Any or all of the vertical applications above may, in addition to providing the aforementioned core functionality thereof, also provide functionality useful according to embodiments of the present invention, such as biometric data processing/user verification, user data collection, and/or the like. For example, communication/transaction services **221** may provide personal identification number (PIN), personal access number (PAN), and/or biometric security with respect to voice, video, and e-mail communications. The features and functions provided by vertical applications and modules of a preferred embodiment as deployed with respect to an exemplary controlled environment facility is discussed in further detail below.

Also shown in the integrated architecture of FIG. **2** is a layer, connect middle-ware **231**, providing interconnection with respect to vertical applications and modules **221-226**. According to the preferred embodiment, connect middle-ware **231** provides voice, video and/or data integration among and between the aforementioned vertical applications and

**12**

modules. For example, connect middle-ware **231** may utilize a plurality of modular interfaces, such as application program interfaces (APIs) as are well known in the art, to arbitrate data communication between and among vertical applications and modules **221-226**. Connect middle-ware **231** preferably provides for modular interconnection with respect to various applications to thereby facilitate addition of applications as desired and/or configuring the information management system for use with respect to particular facilities.

As described above, preferred embodiments of information management systems of the present invention provide connectivity, such as to a variety of user terminal equipment and/or a plurality of information management systems of the present invention, both within and outside of an associated controlled environment facility. Accordingly, connect middle-ware **231** of the illustrated embodiment is coupled to information portal **241**. Information portal **241** provides external connectivity with respect the vertical applications and modules and/or other aspects of the information management system. For example, information portal **241** may provide information communication between any of vertical applications and modules **221-226** and users thereof, via connect middle-ware **231** and network **120**, network **130**, or any of a number of other links. Information portal **241** may facilitate such functionality as voice, e-mail, and/or video conferencing, information and dossier sharing via a network such as the Internet, alert broadcasts, and/or the like.

It should be appreciated that a plurality of communication lines and/or wireless communication links, such as the public switched telephone network (PSTN), cellular networks, personal communication services (PCS) networks, the Internet, cable transmission systems, satellite communication systems, electrically conductive transmission lines, fiber optic links, local area networks (LANs), metropolitan area networks (MANs), wide area networks (WANs), intranets, extranets, and the like, may be utilized in providing information communication according to the present invention. A user might access one or more aspects of information management system **110** via information portal **241** using an interface, such as a browser configuration well known in the art. Similarly, information management system **110**, or systems or users thereof, may access resources external thereto, such as other information management systems, external data bases and servers, user terminals, etcetera, via information portal **241**.

In addition to providing the aforementioned connectivity, information portal **241** of the preferred embodiment provides additional functionality related to information communication. For example, information portal **241** may provide for the collection of real-time call statistics. Similarly, information portal **241** may capture information related to a call or communication, such as automatic number identification (ANI) information, dialed number identification service (DNIS) information, communication routing information, information useful in determining call accounting records, commissions, or other related financial information, and the like. Additionally, information portal **241** is not limited to telephony communication and, therefore, may provide a data firewall, e-mail management, packet or other Internet destination routing, or like functionality useful with respect to data communication.

The integrated architecture of the illustrated embodiment further includes diagnostics **251**. Preferably, diagnostics **251** provides real-time diagnostic monitoring with respect to software and hardware aspects of the information management system. Accordingly, diagnostics **251** of the illustrated embodiment is coupled to connect middle-ware **231** to facili-

13

tate interaction with software and hardware aspects of information management system 110. Moreover, the diagnostic capabilities of diagnostics 251 are preferably available remotely and, therefore, the illustrated embodiment of diagnostics 251 is coupled to information portal 241 via connect middle-ware 231. In operation, diagnostics 251 may monitor operation of information management system 110 to detect anomalous or undesired behavior, such as failure of a hardware component, excessive errors in a communication link, application software error codes, attacks upon system security, and the like, and provide warnings or alarms to operators or service personnel, such as by issuing an e-mail communication or initiating a phone call or pager alert. Similarly, diagnostics 251 may analyze operation with respect to resources of information management system 110, such as available storage space, utilization of communications ports, processing speed, etceteras, to thereby predict undesired behavior for preemptive action. Preferred embodiment diagnostics 251, therefore, operates to minimize the risk of loss of information and the amount of down-time associated with use of information management system 110.

In addition to providing the aforementioned notification of particular conditions, diagnostics 251 preferably provides a user interface, such as using a browser configuration as is well known in the art, to allow an operator to access diagnostics 251 from a remote user terminal for such purposes as performing diagnostics and configuring diagnostics 251. Accordingly, an operator may be located anywhere in the world and access diagnostics 251, via information portal 241, and explore operational aspects of various components, such as circuit cards and application programs.

Referring still to FIG. 2, applications platform 210 of the illustrated embodiment serves as the base on which the integrated architecture of information management system 110 may be constructed as desired. For example, when implemented in software, the elements of the present invention are essentially the code segments to perform the necessary tasks. The program or code segments can be stored in a computer readable medium or transmitted by a computer data signal embodied in a carrier wave, or a signal modulated by a carrier, over a transmission medium. The "computer readable medium" may include any medium that can store or transfer information. Examples of the computer readable medium include an electronic circuit, a semiconductor memory device, a ROM, a flash memory, an erasable ROM (EROM), a floppy diskette, a compact disk CD-ROM, an optical disk, a hard disk, a fiber optic medium, a radio frequency (RF) link, etceteras. The computer data signal may include any signal that can propagate over a transmission medium such as electronic network channels, optical fibers, air, electromagnetic, RF links, etceteras. The code segments may be downloaded via computer networks such as the Internet, an intranet, etcetera.

FIG. 3 illustrates computer system 300 adapted to use the present invention, such as may correspond to platform 210 shown in FIG. 2. Central processing unit (CPU) 301 is coupled to system bus 302. The CPU 301 may be any general purpose CPU, such as a processor from the Intel PENTIUM processor family, or a Motorola POWERPC processor. However, the present invention is not restricted by the architecture of CPU 301 as long as CPU 301 supports the inventive operations as described herein. Computer system 300 may be operating under control of an operating system such as Microsoft WINDOWS NT, or other release of the WINDOWS operating system, UNIX, LINUX, and the like.

Bus 302 of computer system 300 is coupled to random access memory (RAM) 303, which may be SRAM, DRAM,

14

or SDRAM. ROM 304 is also coupled to bus 302, which may be PROM, EPROM, or EEPROM. RAM 303 and ROM 304 hold user and system data and programs as is well known in the art. Bus 302 is also coupled to input/output (I/O) controller card 305, communications adapter card 311, user interface card 308, and display card 309. The I/O adapter card 305 connects to storage devices 306, such as one or more of a hard drive, a CD drive, a floppy disk drive, a tape drive, to the computer system. The I/O adapter 305 is also connected to printer 314, which would allow the system to print paper copies of information such as document, photographs, articles, etcetera Note that the printer may a printer (e.g. dot matrix, laser, etceteras), a facsimile machine, or a copier machine. Communications card 311 is adapted to couple the computer system 300 to a network 312, which may be one or more of a telephone network, a LAN, a MAN, a WAN, the Internet, and/or the like. User interface card 308 couples user input devices, such as keyboard 313, pointing device 307, and microphone 316, to the computer system 300. User interface card 308 also provides sound output to a user via speaker(s) 315. The display card 309 is driven by CPU 301 to control the display on display device 310.

Having broadly described a controlled environment information management system according to a preferred embodiment of the present invention, deployment and operation thereof will be described with respect to an exemplary controlled environment facility to better aid the reader in understanding the concepts of the present invention. Specifically, deployment and operation of information management system 110 with respect to an inmate facility, e.g., a prison, is described below. Accordingly, aspects of information management system 110 as may be particularly adapted for use in an inmate facility is described. However, it should be appreciated that the present invention is not limited to the particular exemplary features and functionality described herein.

Referring now to FIG. 4, information management system 110 is deployed in association with one or more inmate facilities and provides management of various aspects thereof, such as facility management (including tracking residents (inmates) from booking through release), staff management (including time and attendance management and personnel dispatching), call management (including placing and blocking calls, accounting for call charges, distance commerce, determining credit worthiness of individuals, establishing and maintaining accounts, and handling purchases of goods and services), and inmate management (including managing inmate information and tracking inmate activity). Information management system 110 as deployed in the embodiment of FIG. 4 further facilitates communications between a plurality of different individuals and/or groups 411-421. Such groups may include attorneys 411, friends and family 412, vendors 413, victims 414, bail bondsmen 415, judges 416, county agencies 417, police departments 418, other counties 419, states agencies 420, and/or federal agencies 421. Of course, the individuals and/or groups for which communications are facilitated are not limited to those illustrated in FIG. 4 and may include any number of sources and/or destinations for data, including individuals and entities of different countries, various businesses and business types, non-profit organizations, clubs and social groups, law making bodies, etcetera.

Directing attention to FIG. 5A, adaptation of information management system 110 of FIGS. 1 and 2 to provide features and functionality specifically useful with respect to an inmate facility is shown. Specifically, although operable substantially as described above, communication/transaction services 221 (here identified as a call application manager) has

US 7,860,222 B1

15

modules specifically adapted for use in inmate facilities associated therewith, including detainee calling **521**, word search **522**, and visitation and administration phones **523**. Similarly, facility administration manager **222** (here identified as justice application manager) has modules specifically adapted for use in inmate facilities associated therewith, including detainee management system **525** and professional services **526**, in addition to the aforementioned records management system **223** and computer aided dispatch **224**. Video arraignment/visitation **225** (here identified as intelligent video manager) also has modules specifically adapted for use in inmate facilities associated therewith, including video arraignment **528**, video visitation **529**, and tele-medicine **530**.

It should be appreciated that the information management system of the preferred embodiment is readily adaptable for use in various situations, as evidenced by information management system **110** of FIG. **5**A. Moreover, information management systems of the present invention are preferably expandable, upgradable, scalable, and configurable. For example, additional or alternative vertical applications and/or modules may be provided to information management system **110**, as represented by future modules **524**, **527**, and **531** and future vertical application **227**. Similarly, functionality such as shown and described in the above referenced patent applications entitled "System and Method for Reverse Billing of a Telephone Call," "System and Method for Affecting Inmate Conduct With Good Behavior Discount Telephone Rates," "Method and Apparatus for Exchanging Data Between A Primary Computer System And An External Computer System To Ensure Transactional Reconciliation Between The Systems," "Method for Determining an Entity Responsible for Billing a Called Party," "Three-Way Telephone Call Prevention System and Method," and "Optimizing Profitability in Business Transactions" may be incorporated into an information management system of the present invention, if desired.

Operation of information management system **110**, and the aforementioned vertical applications and modules, with respect to the exemplary inmate facility preferably provides functionality in at least two particular areas. The primary areas of functionality provided according to the exemplary embodiment include justice intelligence/management and distance commerce.

Justice intelligence/management preferably provides for safety and security and ensures that the inmates, although they are incarcerated, are not committing or otherwise involved in additional crimes or other undesired activity. Justice intelligence/management may additionally or alternatively provide such functionality as managing the incarceration of the inmate, intelligence gathering/analysis, and management of facility personnel and resources. Accordingly, justice intelligence/management according to the preferred embodiment involves technology that is integrated within the facility (such as one or more of vertical applications and modules **221-226** and **521-531**, connect middleware **231**, information portal **241**, network **120**, and user terminals **121-1** through **121-**N and **122-1** through **122-**M) and outside the walls of the facility (such as network **130** and user terminals **131-1** through **131-**P).

According to one aspect of the exemplary justice intelligence/management functionality, life of the inmates are managed from booking through release. Accordingly, facility administration manager **222**, record management system **223**, and detainee management system **525** may be implemented to facilitate booking of a new inmate, allowing input of an inmate's records, perhaps including data collected in the booking process such as identification photographs, hand-

16

writing and/or voice exemplars or other biometric data, one time while populating data fields for use by various aspects of the invention. Such information may be input into the system in a number of ways, including the use of keyboard, telephonic, PDA, kiosk, touch screen, voice, biometric data scanner, etcetera. This information may be utilized, supplemented, and/or revised by a variety of other applications or modules, such as aforementioned communication/transaction services **221**, computer aided dispatch **224**, video arraignment/visitation **225**, and investigative tools **226**.

Records management system **223** in cooperation with facility administration manager **222** preferably ensures the completion of fields of information desired for the proper management with respect to the inmate. For example, input of medical information and medical profiles may be solicited to ensure the proper administration of medications or physical therapy. Moreover, records management system **223** preferably provides for event tracking to ensure the proper activities have been performed, such as the dispensation of the aforementioned medications or physical therapy. Additional information accepted by facility administration manager **222** and/or tracked by record management system **223** may include gang affiliations (such as may be determined from the inmate's clothing and body art or the individuals to which the inmate places phone calls or receives visits), outstanding warrants and previous arrests (such as may be determined from communication with other government agencies etcetera via information portal **241**), and contacts outside of the facility (such as may be determined from monitoring phone numbers dialed through communication/transaction services **221** or the individuals from which the inmate receives visits). Of course, other information for use in managing the incarceration of the inmate and/or in an intelligence gathering/analysis role may be collected, processed, and/or managed according to the present invention.

Preferably, information collected and managed according to the present invention is made available real-time to those systems, enterprises, and individuals requiring such information. For example, information portal **241** operating in cooperation with record management system **223** may allow an individual, preferably after having cleared security protocols such as using biometric data, personal identification numbers, etcetera, to look at information with respect to the operation of the facility (such as to review revenues, current staffing and resource utilization, current resident population, and the like) and/or information with respect to residents thereof (such as information with respect to booking a particular inmate, the gang affiliation of a particular inmate, statistical information of inmates, the address of a friend or family member of a particular inmate, and the like). Additionally or alternatively, information portal **241** may allow members of the general public, such as individuals who live in and around the inmate facility, to access information on the facility or various individuals, such as information as it relates to sex offenders who might live in the community. According to a preferred embodiment, information portal **241** operates with respect to a browser interface for accessing such information.

According to another aspect of the exemplary justice intelligence/management functionality, computer aided dispatch **224** is provided to allow guards, patrol officers, investigators, and the like to lookup information about inmates and/or to facilitate the deployment of resources and personnel as needed. Accordingly, computer aided dispatch **224** of the exemplary embodiment integrates not only with facility administration manager **222** (such as for personnel availability from time and attendance records) and record management system **223** (such as for information with respect to

17

particular inmates), but also with, in the case of a sheriff's department, for example, their on-street force so that the patrol officers can in fact look up information about inmates and investigators can share information with the patrol officers.

A further aspect of the exemplary justice intelligence/management functionality provides for enhanced access at any distance through video arraignment/visitation **225**. For example, individuals disposed remotely with respect to the facility may be given virtual visitation access to an inmate using video visitation **529**. Similarly, an inmate may be given virtual access to particular events and venues, such as court appearances and arraignment proceedings using video arraignment **528** and/or tele-medicine **530**. Moreover, using integration with respect to such aspects as facility administration manager **222** and/or record management **223**, information with respect to the inmate may be made available to the attorney and judge.

A still further aspect of the exemplary justice intelligence/management functionality provides justice intelligence through investigative tools **226**. Communication/transaction services **221**, utilized in providing telephone calling from and to inmates, and video arraignment/visitation **225**, used in providing visitation of inmates by friends and family, may provide detailed information with respect to an inmate, his activities, and those he associates with and facility administration manager **222** may collect detailed information with respect to an inmate and their activities. Accordingly, information management system **110** of the preferred embodiment has access to very rich investigative information. For example, from analyzing calls placed through communication/transaction services **221**, it may be known who is making a call, who is the called party, and the content of the call may even be monitored and/or recorded. Investigative tools **226** may log all the calls so that an investigator may research them through an archive. Additionally or alternatively, investigative tools **226** may be provided access to internal and/or external criminal databases and/or other sources of useful information.

Investigative tools **226** are preferably utilized not only to directly identify and harvest data from such internal and external databases, but also to spawn extended or indirect data identification, correlation, and/or harvesting of data, such as through recognizing crossing points or confluence of information aspects and initiating database hops for exploring additional, e.g., related or relevant, data. The databases from which such data is harvested may be unrelated (e.g., a calling services database, a commissary services database, and an inmate records database, all associated with a same facility or different facilities, which include disjoint information).

FIG. **5**B shows a graphical representation of the data framework provided according to one embodiment using information management system **110** of FIG. **5**A. In the data framework of FIG. **5**B, one or more of information management system **110** gather data (shown as data gathering **501**), such as using call application manager **221**, justice application manager **222**, and/or intelligent video manager **225** to collect, compile, and collate data passing through information management system **110** or otherwise available thereto. Data, including that which is gathered by information management system **110** and that which is otherwise available to information management system **110**, may be stored (shown as data storage **502**) in any of a number of databases, such as jail management databases (e.g., associated with justice application manager **222**), communication and/or transaction databases (e.g., associated with call application manager **221**), criminal databases (e.g., associated with governmental

18

entities such as the FBI), public databases (e.g., associated with various public and/or governmental entities), and/or the like. One level of data processing by information management system **110** may provide data aggregation (shown as data aggregation **503**), such as by parsing information relevant to individuals, events, locations, etcetera to provide data associations (e.g., compile dossiers, event timelines, etcetera). Another level of data processing by information management system **110** may provide data harvesting and database hopping (shown as data harvesting intelligence **504**), such as by utilizing multi-dimensional, multi-informational vectors to directly identify and harvest data from the IT fabric, as well as to spawn extended or indirect data identification, correlation, and/or harvesting of data through recognizing crossing points or confluence of such vectors and initiating database hops for exploring additional data. A still further level of data processing by information management system **110** may provide artificial intelligence and predictive modeling (shown as predictive model **505**), such as by applying fuzzy logic to recognize trends, similarities, correspondence, and/or other indirect links between otherwise independent information.

Investigative tools **226** may utilize speech to text technology, such as employed within word search **522**, to monitor a call (including voice over internet protocol (VoIP) and plain old telephone service (POTS) calls) and/or video conference, preferably in real-time, for the presence of particular words or phrases. Similarly, investigative tools **226** may utilize word search **522** to monitor an e-mail and/or postal mail (such as may be converted to electronic format using optical scanner technology), preferably in real-time, for the presence of particular words or phrases. Such words or phrases may be those generally worrisome with respect to an inmate population, such as gun, bomb, and kill, or may be words or phrases identified as having importance with respect to a particular inmate, such as the name of a gang, the name of a sentencing judge in combination with threatening words, or the name of a victim. A facility may implement a personalized or customized dictionary for use at that facility or with respect to particular inmates to detect particular words, such as local colloquialisms or slang commonly utilized in the area, if desired. When such words or phrases are detected, investigative tools **226** may page, or otherwise contact, an associated investigator to alert him to the situation. The investigator may be connected to the call real-time to allow him to listen to the conversation and/or a recording of the call may be provided to the investigator for further analysis. Additionally or alternatively, the investigator may be provided with a dossier or other information on the particular individual or individuals to the communication.

According to an embodiment of the invention, an investigator is able to control various aspects of the call and/or the monitoring thereof, such as to disconnect one or more parties from the call, to "bookmark" a position in the call, to "barge" into the call in order to speak to one or more of the parties to the call, etcetera. For example, an investigator may "barge" into a call, such as to converse with one party to the call (e.g., the calling party or the called party) while blocking other parties to the call or to converse with multiple parties to the call. The investigator may listen to a call after having been notified that the call met one or more criteria and, perhaps after monitoring the conversation to determine that the call is associated with some form of undesired communication, elect to barge into the call (e.g., by pressing a DTMF key such as "#" or "*" or by other signaling methods). Similar signaling may be used by the investigator to disconnect the call, to disconnect the investigator's leg of the call, to transfer and/or

**19**

conference the monitoring leg of the call to another investigator or other destination, to record notes about the call, and/or the like.

Additionally or alternatively, an investigator may utilize a computer or other data processing system to determine that a call of interest is in progress or has been recorded. For example, an investigator may view a web page on a web browser which shows calls of potential interest (e.g., calls from/to particular individuals, calls in which particular words or phrases have been uttered, calls from/to particular phone numbers or other addresses, calls associated with a particular facility, etcetera) which are transpiring or which have transpired, allowing the investigator to select a call to listen to and/or to barge into.

An investigator may be notified of a particular call or be connected to a particular call as a result of the aforementioned word search capability. However, additional or alternative triggers may be implemented to notify or connect an investigator. For example, criteria such as the placing of a call to a particular called number, a particular individual placing or receiving a call, a particular calling feature such as three-way calling being invoked, a velocity of calls (i.e., number of calls per period of time) to a particular called number or by a particular individual exceeding a threshold or sharply increasing may be monitored or analyzed in order to trigger a notification to an investigator to provide the investigator an opportunity to barge into the call. Rather than providing a notification to an investigator, embodiments of the invention may operate to automatically connect the investigator to the call, e.g., by placing a call to the investigator's office phone, cell phone, multi-media computer, or other device(s) selected by the investigator, perhaps preceded by a message announcing that the call is a real-time monitoring event and providing relevant information (e.g., identification of one or more parties to the call, identification of the facility associated with the call, identification of the trigger instigating the call monitoring, etcetera). Moreover, the monitoring event may be established automatically, such as upon connection of the investigator to the call, without awaiting signaling from the investigator.

An investigator may be enabled to barge into a call originated by a resident of a facility to an individual outside of the facility, a call originated by an individual outside of a facility to a resident of a facility, a visitation call conducted within the facility, etcetera. When baring into the call, the investigator may block one party to the call in order to converse with the other party to the call. For example, an investigator pressing a DTMF "#" key may signal a system of an embodiment of the present invention to block the called party and establish communications between the investigator and the calling party. For example, pressing the "#" key may place the investigator in full duplex communication with a calling party and block the called party (perhaps playing an announcement to inform the called party that the call has been blocked). Similarly, an investigator pressing a DTMF "*" key may signal a system of an embodiment of the present invention to block the calling party and establish communication between the investigator and the called party. For example, pressing the "*" key may place the investigator in full duplex communication with a called party and block the calling party (perhaps playing an announcement to inform the calling party that the call has been blocked). Additionally or alternatively, systems of embodiments of the invention are able to identify a party which is the subject of an investigator's attention, such as by PIN identification used to initiate the call, facilitating blocking of the other party and establishing communication

**20**

between the investigator and the appropriate party without the investigator knowing whether the target was the calling or the called party.

Where an investigator wishes to communicate with multiple parties to the call, a key or key sequence may be provided to control such communications. For example, pressing both the "#" and "*" keys may place the investigator in full duplex communication with a calling and called party.

Call control provided to the investigator according to embodiments of the invention may additionally or alternatively control functionality other than communication duplexing. For example, while monitoring a call an investigator may wish to "bookmark" a particular location in the call, such as when a particular word was spoken or when particular subject matter is being discussed, to readily locate content of interest in a recording of the call. Accordingly, the investigator may press one or more DTMF key, or implement another signaling method, to place a bookmark at the current location. Various different bookmarks, such as DTMF "1", "2", etcetera, may be used within a call or calls to group or relate content, to place bookmarks indicative of different points of interest in the call, etcetera.

An investigator may be enabled to provide notes in association with a call. For example, an investigator may speak or otherwise input notes, perhaps after providing a control signal to indicate notes are to be recorded, during monitoring of a call while muted from the calling and called parties. Similarly, an investigator may speak or otherwise input notes, perhaps after providing a control signal to indicate notes are to be recorded, after the investigator has disconnected from the call or after the call has been terminated.

As an exemplary embodiment, a DTMF "1" may place a bookmark indicative of a threat being made, referenced, alluded to, etcetera, a DTMF "2" may place a bookmark indicative of a particular keyword of interest having been spoken, a DTMF "3" may place a bookmark indicative of a person of interest having been mentioned, referenced, spoken, etcetera, a DTMF "4" may place a bookmark indicative of an investigator's notation (e.g., audio, textual, and/or graphical information that the investigator wishes to associated with the call at a designated point) being appended to the call, etcetera. Of course, the foregoing are merely exemplary of signaling which may be used in placing bookmarks and the various meanings which may be associated with such bookmarks.

It should be appreciated that the foregoing bookmarks may be placed by an investigator or other personnel while monitoring a call in real-time, whether having barged into the call or monitoring the call while being muted from the calling and called party, or while reviewing a recording of a monitored call. For example, if monitoring a recorded call, an investigator may provide signaling, such as using the foregoing DTMF tones, to the controlled environment information management system, or portions thereof, while the call is played back to place bookmarks and notes at or in association with appropriate points in the call. Replay of the recorded monitored call may be suspended during entry of such signaling and/or investigator notes in order to allow the investigator to hear the entire call. For example, if the investigator signals that an investigator's notation is to be appended to the call, the playback of the call may be suspended while the investigator speaks a message, or otherwise inputs desired notation information.

If monitoring a call in real-time while being muted, an investigator may similarly provide signaling, such as using the foregoing DTMF tones, while listening to the call without the calling and called party hearing such signaling. Moreover,

US 7,860,222 B1

21

the investigator may input the contents of an investigator's notation without the calling and called party hearing such input, although perhaps the investigator may miss a portion of the call during such input due to his attention being focused on inputting information. Embodiments of the invention implement real-time recording to facilitate pausing the call as heard by the investigator during input of such information and continuing with quasi real-time playback thereafter. Additionally or alternatively, embodiments of the invention allow an investigator to use short signaling pulses, such as the aforementioned DTMF tones, during real-time call monitoring, allowing the investigator to supplement the input thereafter, such as to input the content of an investigator's notation at a position marked with a DTMF "4" after the call has been completed (e.g., the calling and called party release the line).

If monitoring a call in real-time while barging into the call (e.g., the investigator is not being muted with respect to one or more of the calling and called parties), an investigator may still provide signaling, such as using the foregoing DTMF tones, while listening to the call without the calling and called party hearing such signaling. For example, functionality of the controlled environment information management system may filter such signaling from the stream ultimately provided to the calling and/or called party. The foregoing filtering may be with respect to predefined signals, such as DTMF tones, and/or may be with respect to other signals and/or information. For example, an investigator may provide a DTMF "4" to indicate that investigator's notations are to be appended to the call recording causing the investigator's voice to be filtered from the calling and/or called party during audio input of a notation message by the investigator. Such muting may continue for a predetermined amount of time determined sufficient to allow input of a notation or may be controlled by the investigator, such as by input of a signal (e.g., second input of a DTMF "4").

According to embodiments of the invention, an IVR provides a menu after an investigator has disconnected from a call in order to facilitate various functions, such as the aforementioned appending of notes. Such a menu may facilitate functions such as the investigator obtaining or receiving reports with call details, a bookmarked call recording, the investigators notes, etcetera. The foregoing reports may be communicated to the investigator electronically, such as by electronic mail, or by other means. Moreover the reports may be provided to other investigators, groups of investigators, etcetera.

Although embodiments have been described above with reference to signaling being provided in-band with respect to a call (e.g., DTMF tones and voice), signaling may be provided out of band, whether by a separate link or out of band on a call link. For example, when an investigator is notified of a call of interest, the investigator may not only be coupled to the call by an audio link for monitoring the call, but may also be provided with a user interface for providing information, control, etcetera, such as may be provided by the investigator dashboard described below. An embodiment of the invention provides a graphical user interface, such as via a web page, allowing an investigator to provide signaling, such as the aforementioned bookmark signals and investigator's notations, and/or provides information regarding the call to the investigator, such as information regarding the calling and/or calling parties, the controlled environment facility, the call itself (e.g., duration, originating and/or terminating numbers, etcetera), and/or the like. Such a user interface is described further below with reference to the investigator dashboard of an embodiment of the invention. The information and control user interface and audio link may be provided by separate

22

user terminals (e.g., a web page accessed via computer whereas the audio link is provided by a POTS line) or may be provided by the same user terminal (e.g., a multimedia computer providing both an audio reproduction of a call and access to a information and control web page).

Although the above embodiments have been described with reference to calls, it should be appreciated that an investigator may be enabled to barge into communications in addition to or in the alternative to calls. For example, video communications and electronic mail communications may be monitored for providing listening and/or barging capabilities to an investigator. Likewise, notifications provided to an investigator according to embodiments of the present invention are not limited to calls. For example, an investigator may establish criteria for a notification of when a particular individual receives a visitor or a visit from a particular individual. Moreover, such notifications need not be associated with a real-time event, such as a call or visitation. For example, an investigator may be notified when a particular individual is added to a resident's visitation list, although the actual visitation will not occur until some time in the future. An investigator may utilize such information for approving/disapproving a visitor, conducting a background check of a visitor, scheduling monitoring of visitation calls, etcetera. Accordingly, one or more investigators may be provided the ability to check all visitors coming in to a facility, facilitating their making arrests of criminals that visit other criminals, contacting individuals wanted for questioning, etcetera.

Investigative tools **226** may similarly monitor other aspects of an inmate's activities for use in an intelligence role. For example, the fact that a call was placed by a particular inmate to a particular known associate may indicate that a criminal act is likely being contemplated, thereby providing a predictive model for investigative reporting. Similarly, broadcast alerts may be provided to particular individuals upon the occurrence of a predetermined trigger, such as a particular event. According to one embodiment, a subscription process is proved for creating alerts, receiving dossier updates or update notices (e.g., via e-mail), receiving notice or the content of a communication when an identified individual is involved in the communication (e.g., phone bridge in real-time during a call or receiving a recording of a call), etcetera.

The use of predictive models using investigative tools **226** of embodiments of the present invention may analyze or identify patterns of various individuals, such as through use of calling information, purchasing information, e-mail and/or postal mail communications, known associates, known physical attributes (e.g., presence and content of tattoos, hair style, apparel color and style), addresses and/or areas known to particular individuals, particular key words from communications, and/or other information available to an information management system of the present invention, to identify a list of potential suspects for a particular investigation. For example, an investigator may input as many details as are known about a crime, such as a gang affiliation of a victim, a general description of an assailant, an area of the crime, and any names of individuals known to be involved or associated with the crime in any way, and fuzzy logic of investigative tools **226** may query various databases available thereto to identify and harvest data and to spawn extended or indirect data identification, correlation, and/or harvesting of data, and compile a list of individuals having characteristics or attributes which predictive modeling suggest may be associated with the crime.

Preferred embodiments of the present invention may utilize report generators within the system to sort information according to a myriad of different report capabilities for pro-

US 7,860,222 B1

23

viding information about inmates and their activities. For example, in addition to providing a list identifying potential suspects in response to an investigative query, embodiments of the present invention may present dossiers, such as may be compiled from available information, on the identified individuals.

It should be appreciated that, as communication/transaction services **221** of the preferred embodiment essentially provides the inmates' calling capacity, information management system **110** is in a unique position to obtain valuable investigative information, such as the inmate placing the call, the person who is accepting the call, and the content of the call. Moreover, information management system **110**'s deployment with respect to various aspects of controlled environment facility **100** provides a unique opportunity to collect additional information valuable to investigative aspects as well as provides a relationship with the facility and its personnel to facilitate assisting the investigator. Availability of information associated with a plurality of facilities, such as through the aforementioned connectivity of a plurality of information management systems **110** and/or centralized implementation of information management system **110**, facilitates data analysis and aggregation useful in spotting trends and relationships, as well as providing a more complete picture with respect to individuals and their activities. Accordingly, an investigator may utilize an information management system of an embodiment of the invention to perform a national number search to look across a plurality of controlled environment facilities and determine if there are common telephone numbers (or other addresses, e.g., e-mail addresses, physical addresses, etcetera) contacted by residents of different controlled environment facilities. Likewise, an investigator may utilize an information management system of embodiments of the invention to perform a reverse lookup with respect to a telephone number (or other address, e.g., e-mail address, physical address, etcetera) a resident contacts, such as through the use of billing name and address attributes, account information, etcetera, and/or to perform background searches with respect to individuals contacted by a resident, such as to determine if the individual has a warrant outstanding, has a previous conviction, etcetera.

It should be appreciated that investigative tools **226** is not limited to use of information with respect to calls made outside of the inmate facility, such as utilizing detainee calling **521**. For example, investigative tools **226** may utilize information with respect to visitation phones deployed within the inmate facility, such as by communication with visitation and administrative phones **523**. For example, the investigator may be connected to a visitation call real-time as discussed above to allow him to listen to the conversation and/or a recording of the call may be provided to the investigator for further analysis. Additionally or alternatively, the investigator may be able to "barge" into the visitation call as discussed above.

Additionally, the connectivity provided by information portal **241** of the preferred embodiment may further facilitate assisting the investigator, such as it might relate to counties communicating with counties, counties communicating with police departments, etcetera. For example, investigators within the walls of the inmate facility may be enabled to tap into the law enforcement or other databases at the federal level, the state level, and/or the local level.

Such connectivity may not only be utilized to share information between various individuals, agencies, etcetera, but may also be used to aggregate, distil, and/or organize information. For example, the foregoing connectivity may be utilized to complete a dossier or "investigative jacket" on an individual or case by collecting information from various

24

sources and/or by various investigators working with a dossier to develop a more complete picture of the individual or case.

Such connectivity may be utilized in providing broad outside functionality such as the warrant system of a preferred embodiment. Such a system may be utilized to efficiently determine inmates for which warrants are outstanding in other jurisdictions as well as to facilitate expedient disposal of many such warrants. For example, if someone is out on the street, such as having skipped bail for failing to appear for a court appearance, and a warrant was issued for their arrest, the level of integration provided by a preferred embodiment information management system facilitates analysis of such outstanding warrants with respect to an inmate, such as at the time of booking. Accordingly, facility administration manager **222** may cooperate with record management system **223** and/or information portal **241** to determine if there is an outstanding warrant. Information portal **241** may connect to information management systems associated with other controlled environment facilities, may access countywide, statewide, or countrywide systems, etcetera to determine if the particular individual being booked in using facility administration manager **222** has any outstanding warrants. For example, the system may communicate with the courts to obtain such information as a county which has issued a warrant.

According to a preferred embodiment information management system, not only are steps taken to determine if warrants are outstanding with respect to a particular individual, but further steps are taken to dispose of the warrants where possible. Therefore, after having determined a county in which an outstanding warrant exists for a particular individual, the system may communicate with the appropriate county agency to notify them that this individual is now in custody. There may be communication to verify that the person for which the warrant was issued is in fact the one in custody, such as by the information management system transmitting fingerprint, photographic information, and/or other biometric data.

It should be appreciated that the notified county could be hundreds of miles away which, in typical situations, would require the county issuing the warrant to dispatch personnel to obtain custody of the individual, while the arresting facility holds the individual (perhaps for a number of days) at their expense. However, preferred embodiments of the present invention facilitate disposal of particular types of warrants without physical transfer of the inmate and perhaps without the arresting facility holding the inmate for substantial periods of time. Specifically, the distance commerce aspect of the preferred embodiment, described in further detail below, facilitates the collection of funds, such as from friends or family at remote locations, and the distribution of funds to the agency issuing the warrant as well as to the arresting facility. Accordingly, where the outstanding warrant may be satisfied by restitution and/or modest incarceration times, the agency issuing the warrant may be enabled to collect restitution via the preferred embodiment distance commerce aspect and thus satisfy the warrant. Similarly, the arresting facility may be reimbursed for their expenses in the arrest and/or incarceration of the individual from such funds and/or from a portion of the amounts paid to the agency issuing the warrant.

Distance commerce preferably provides such functionality as establishing and maintaining an account associated with each individual inmate, allowing deposits into such accounts by friends and family (such as telephonically, at retail locations, and in person at the controlled environment facility), allowing an inmate to obtain goods and services (such as

US 7,860,222 B1

25

placing telephone calls and obtaining commissary items) using an associated account for payment, and making credit worthiness decisions for management of the accounts. Accordingly, distance commerce according to the preferred embodiment involves technology that is integrated within the facility (such as one or more of vertical applications and modules **221-226**, connect middle-ware **231**, information portal **241**, network **120**, and user terminals **121-1** through **121-N** and **122-1** through **122-M**) and outside the walls of the facility (such as network **130** and user terminals **131-1** through **131-P**).

From the above it should be appreciated that information management systems of the present invention may implement data networking, whether with other information management systems or other data processing systems, to provide robust functionality as described herein. FIG. **6A** shows architecture **60** according to one embodiment, providing an information network configuration including justice information network **61**. Justice information network **61** of the illustrated embodiment provides a communication architecture allowing access to data from a plurality of locations, by a plurality of divergent users having different levels of authority and having different enterprise affiliations. For example, user terminals and/or information management systems may be disposed at any of a number of locations, facilities, businesses, homes, etcetera, such as government offices **62**—a through **62**-d, investigative services **63**-a through **63**-d, and/or prison facilities **65**-a through **65**-d, service providers **66**-a through **66**-d, and/or homes/businesses **67**, with justice information network **61** facilitating information communication therebetween. The user terminals may include mobile and remote terminals, e.g., investigators on the street and terminals in patrol cars, to allow users to access, input, modify, query, etcetera information managed by one or more information management system.

Directing attention to FIG. **6B**, further detail with respect to a preferred embodiment configuration of architecture **60** is shown. In the embodiment illustrated in FIG. **6B**, justice information network **61** comprises hub **610** providing information communication between nodes **621-624** and user terminals **631-632**. It should be appreciated that the present invention is not limited to the particular number of user terminals, hubs, and/or nodes shown in FIG. **6B**, but rather the particular configuration illustrated is merely exemplary of a possible configuration according to the teachings of the present invention.

Hub **610**, nodes **621-624**, and user terminals **631-632** may comprise computer systems, such as computer system **300** described with respect to FIG. **3**. For example, according to one embodiment of the present invention, hub **610** comprises a computer system or computer systems based upon the Intel PENTIUM platform of CPUs configured to operate in a server capacity under control of the Linux operating system, as is well known in the art. Such a server configuration may have proprietary and/or open source software operable thereon to provide operation as described herein. Nodes **621-624**, like hub **610**, may comprise computer systems based upon the Intel PENTIUM platform of CPUs and having information management functionality associated therewith (e.g., call applications manager (CAM), also referred to herein as communication/transaction services, and/or justice applications manager (JAM), also referred to herein as facility administration manager) as described above with respect to FIGS. **1** and **2**. User terminals **631-632**, which again may comprise computer systems based upon the Intel PENTIUM platform of CPUs or other processor based systems (e.g., PDAs, pocket PCs, cellular telephones, etcetera), preferably

26

have browser based or other client software operable thereon to provide operation as described herein.

It should be appreciated that nodes **621-624** may be deployed at any number of locations, such as in association with any of government offices **62**-a through **62**-d, investigative services **63**-a through **63**-d, and/or prison facilities **65**-a through **65**-d shown in FIG. **6A**, may be disposed in a centralized or regionalized configuration, and/or may be mobile. Similarly, user terminals **631-632** may be deployed at any number of locations, such as in association with any of government offices **62**-a through **62**-d, investigative services **63**-a through **63**-d, and/or prison facilities **65**-a through **65**-d, service providers **66**-a through **66**-d, and/or homes/businesses **67** of FIG. **6A**, and/or may be mobile. Hub **610** may also be deployed at a variety of locations, such as at a central location associated with a service provider facilitating the deployment and interconnection of information management and retrieval systems of the present invention.

Communication links **641-644**, providing information communication between hub **610** and nodes **621-624**, and communication links **651-652**, providing information communication between nodes **621-624** and user terminals **631-632**, may comprise any number of links, such as the PSTN, cellular networks, PCS networks, the Internet, cable transmission systems, satellite communication systems, electrically conductive transmission lines, fiber optic links, wireless LANs, LANs, MANs, WANs, intranets, extranets, and/or the like.

Although user terminals **631-632** are illustrated coupled to respective ones of nodes **623-624** and nodes **621-624** are illustrated coupled to hub **610**, it should be appreciated that hub **610** may facilitate communication between any of nodes **621-624** and user terminals **631-632**. For example, hub **610** may comprise various indices or lookup tables (LUTs) adapted to identify particular systems storing information relevant to a query from another system or user, and thus direct a connection between such systems and users. The connections provided in response to such queries may be provided through hub **610** (e.g., a user at user terminal **631** connected to node **624** may be coupled to node **622** via hub **610** using links **651**, **644**, and **642**). Such a connection via hub **610** may be transparent to the users, thereby providing a virtual direct link between particular systems of architecture **60**. Additionally or alternatively, hub **610** of embodiments of the present invention may facilitate more direct connections between systems and/or users (e.g., after querying hub **610** for identification of a system having information relevant to a query, node **624** may establish a link, such as via the Internet or PSTN, to the identified system, such as to connect to node **622** via a link (not shown) which does not include hub **610**).

It should be appreciated that a plurality of different systems and information communication links may be implemented in providing a justice information network of the present invention. For example, referring again to FIG. **6A**, systems of County A Courthouse **62**-b, Police Department **63**-a, and County A Jail **65**-a may be interconnected and/or connected to justice information network **61** by a telephone line (or wireline or wireless), the Internet, a LAN connection, and/or the like. According to one embodiment of the present invention, these corresponding entities may utilize a same link to justice information network **61**. For example, each of these corresponding entities may share the use of an information management system and utilize an interface thereof for linking to justice information network **61**. Additionally or alternatively, these entities may utilize separate links for connecting to justice information network, such as where each such entity has an information management system associated

US 7,860,222 B1

27

therewith or where other systems of such entities are otherwise adapted for communication with justice information network **61**.

Moreover, various ones of the entities illustrated in FIG. **6**A may utilize different systems for accessing justice information network **61**. For example, various ones of the entities, such as inmate facilities **65**-*a*, **65**-*b*, **65**-*c*, and **65**-*d*, may employ an information management system of their own, preferably having a variety of user terminals connected thereto. Alternatively, various ones of the entities, such as individuals/businesses **67** and service providers **66**-*a*, **66**-*b*, and **66**-*c*, may employ user terminal equipment adapted to interface with information management systems of the present invention. As mentioned above, such user terminals may be operable under control of a web browser interface, a customized browser interface, or other user interface as desired.

Preferably, a wide range of facilities, agencies, business entities, individuals, and/or systems are provided access to and participate in architecture **60** of the preferred embodiment. For example, in the illustrated embodiment District Attorney/Courthouse **62**-*a* is linked to justice information network **61**, such as to provide data access and information exchange for the courts, judges, attorneys, etcetera. Additionally, County A Courthouse **62**-*b*, Police Department **63**-*a*, and County A Jail **65**-*a* are shown interconnected and linked to justice information network **61** in the illustrated embodiment, such as to provide data access and information exchange for courts, judges, attorneys, sheriffs departments, constables, jail staff, inmates, etcetera. Similarly, County B Office **62**-*c*, Police Department **63**-*b*, County B Courthouse **62**-*c*, and County B Jail **6**-*b*, are shown interconnected and linked to justice information network **61** in the illustrated embodiment, such as to provide data access and information exchange for county officials, courts, judges, attorneys, sheriffs departments, constables, jail staff, inmates, etcetera. Also shown connected to justice information network **61** in the illustrated embodiment are private businesses **66**-*a*, **66**-*b*, **66**-*c*, and **66**-*d* (e.g., wire transfer service providers providing money and/or message transfer services, pawn shops providing information with respect to received items, credit facilities providing information with respect to individuals and/or funding for transactions, merchandise providers, etcetera), incarceration facilities **65**-*a*, **65**-*b*, **65**-*c*, and **65**-*d* (e.g., federal prison, military stockade, municipal jail, county jail, state penitentiary, etcetera), investigative agencies **63**-*a*, **63**-*b*, **63**-*c*, and **63**-*d* (e.g., police department, sheriffs department, National Security Agency (NSA), Federal Bureau of Investigation (FBI), etcetera), and individuals/businesses **67** (e.g., family and friends of an inmate, victims, inmate's rights activists, etcetera).

In addition to the above identified facilities, agencies, business entities, and individuals coupled to justice information network **61** discussed above, FIG. **6**A shows systems providing data and/or processing useful according to the present invention. For example, in addition to the aforementioned information management systems of the present invention, database **68** (e.g., a public database such as PUBLICDATA-.COM) is shown coupled to justice information network **61** to provide an additional source of data to the users and systems thereof. Similarly, communication system **66**-*b* (e.g., telephony message delivery system, interactive voice response system, electronic mail transmission system, etcetera) is shown coupled to justice information network **61** to provide a communication gateway useful therewith.

Systems of architecture **60** preferably use open Internet technology and standards which link diverse and incompat-

28

ible systems. Embodiments of the invention utilize web services technology deployed in a services oriented architecture to provide data location, collection, compilation, aggregation, distillation, and/or reporting as described herein. The use of the aforementioned web services technology facilitates access to public databases, such as PublicData.com and Rap-Sheets.com. The use of a services oriented architecture according to embodiments facilitates accessing information from vertical applications, such as communication/transaction service **221**, facility administration manager **222**, video arraignment/visitation **225**, and investigative tools **226**. For example, extensible interfaces, such as may utilize an extensible markup language (XML), may be implemented to collect, concatenate, and merge data associated with a plurality of facilities and individuals.

Although an architecture implemented according to embodiments of the invention may be centralized, e.g., with vertical applications and databases of a plurality of facilities located at a shared site, operation of preferred embodiments appears to users thereof as a decentralized architecture. For example, an investigator or facility administrator may utilize a user terminal to access information in a manner appearing as if the facility is equipped with a local information management system. However, the user terminal may be communicating with a centralized information management system which serves a plurality of facilities. Although operation of such a centralized information management system may provide access to one or more of the aforementioned vertical applications as if those applications were unique to a particular facility, data associated with, created by, and/or available from various facilities may be available to users, such as for investigative purposes.

Users are preferably provided seamless access to the various resources of the information management system, such as logging on a single time to access all of the resources available to that particular user. Of course, multiple levels of access for particular resources may be established with respect to a user, if desired.

Various user terminals, such as those implemented by users only casually related to the justice information network or systems thereof (e.g., friends and family members of an inmate, individuals and private businesses outside of the justice industry such as a pawn shop, victims, etcetera), may implement a web browser, as is well known in the art. Additionally or alternatively, various user terminals, such as those implemented by users more directly related to the justice information network or systems thereof (e.g., individuals and businesses directly involved in the justice industry such as prison staff, police, judges, prison commissary, etcetera, individuals and private businesses having a close or particular relationship with the justice industry such as businesses accepting payments for inmate accounts, businesses providing services such as video visitation, private detectives, etcetera), may implement an interface customized for use with the justice information network, such as a customized browser type interface. Of course, various features, options, and resources may be made available within a web browser or other user interface, such as based upon the particular user, a class of user, etcetera. It should be appreciated that such interfaces may be adapted to interface with biometric data collection devices, such as microphones (e.g., for voice prints), fingerprint scanners, iris and/or retina scanners, hand scanners, cameras (e.g., for face recognition), etcetera, and/or to otherwise use biometric data.

In operation according to a preferred embodiment, users of justice information network **61** will download a browser, such as one of the aforementioned browsers, to a user terminal,

**29**

such as user terminals **631-632**. The users may then use the browser to connect to an appropriate node, such as a particular one of nodes **621-624** deployed at a facility to which the user is associated, and/or to connect to a justice information network hub, such as hub **610**. Using the browser interface, users are preferably enabled to perform search engine based searches for desired information, such as inmate dossiers, call records, transaction records, etcetera, as stored throughout architecture **60**. For example, nodes **621-624** may continually monitor justice applications manager functionality and/or call applications manager functionality to build accurate and current dossiers for each inmate associated therewith. Hub **610** may index inmate dossier information from nodes **621-624**, such as continually or periodically. For example, nodes **621-624** may periodically send metadata derived from monitoring justice applications manager functionality and/or call applications manager functionality to facilitate advanced searching. When a query is issued via one of user terminals **631-632** by an authorized user and received at hub **610**, the search query may be pointed to one or more of nodes **621-624** for the relevant information.

In one embodiment, a web browser is used at any number of user locations to gain access, by the user, to data contained in databases maintained at any number of facilities or other sources of information, thereby providing anytime, anywhere access to robust data. Interactive "web pages" may be provided to a user via a web browser which conveniently provides access to a number of tools useful to particular users. For example, one embodiment provides an investigator "dashboard" configuration as shown in FIG. **7** to facilitate investigators' access to investigator tools.

The embodiment illustrated in FIG. **7** provides web page **700**, such as may be displayed upon a standard web browser, having menus comprising an investigator dashboard to present and facilitate selection of various investigative tools (e.g., provided by investigative tools **226** of FIG. **2**) available to the particular user utilizing the web page. Specifically, web page **700** includes a main investigative tool menu **710** presenting such investigative tools as real-time monitoring, real-time call recording, remote call surveillance, detailed call log, remote call conferencing, call tracker, visitation phone monitoring, investigations case file generator, investigative reports, inmate alerts, mug shot lineup, inmate arrest history, audio/data recording, restricted reports, call detail reports, national database search, inter-agency assistant access, and inmate assistant access. Selection of an investigative tool from a menu of web page **700** may access a corresponding application, database, or system, perhaps via an intervening web page soliciting information such as a particular individual for which information is being requested, particular dates for which information is being requested, particular phone numbers or other addresses for which information is being requested, particular facilities for which information is being requested, and/or the like. Additionally or alternatively, various sub-menus may be associated with particular investigative tool selections. For example, sub-menus **720-770** are associated with particular selections of respective menus/sub-menus to present further options for selection. Such a menu structure may be implemented to guide a user through a plurality of selections of a robust system.

FIG. **8** shows an exemplary embodiment of a web page as may be provided to an investigator by an investigator dashboard or other user interface according to embodiments of the invention. Web page **800** of the illustrated embodiment provides an information and control user interface that may be used by an investigator in association with monitoring a call, such as by selecting "Real-Time Monitoring" from main

**30**

investigative tool menu **710**. For example, an investigator may receive an alert that a call meeting one or more monitoring criteria is in process and thus when the investigator selects "Real-Time Monitoring" from main investigative tool menu **710** the call having had an alert issued for that investigator is selected as an active call for monitoring and web page **800** is presented with information and control being provided with respect to the selected call. Similarly, where an investigator is currently monitoring a call via an audio connection (e.g., a telephone monitoring the call via a connection to the controlled environment information management system, wherein the investigator has been identified or authenticated by the system), selection of "Real-Time Monitoring" from main investigative tool menu **710** may result in that call being selected as an active call for monitoring and web page **800** is presented with information and control being provided with respect to the selected call. Additionally or alternatively, a user may select a particular call for monitoring using web page **800** from a menu of calls, such as may include calls associated with a particular identified person, calls originating from an identified address, location, facility, number, etcetera, calls directed to an identified address, location, facility, number etcetera, calls meeting one or more criteria, and/or the like.

Although the illustrated embodiment references real-time monitoring of a call, it should be appreciated that the same or similar information and control user interface may be utilized with respect to recorded monitored calls. Moreover, although embodiments are described herein with reference to a web page configuration, it should be appreciated that information and control user interfaces useful according to the invention may be implemented using various architectures and protocols.

Web page **800** of the illustrated embodiment includes various informational and control sections. Specifically, various information relevant to the call being monitored is presented in call information section **810** and various controls and/or control prompts are presented in call control section **820**. In addition to the aforementioned call information section and call control section, the embodiment illustrated in FIG. **8** includes a graphical representation of the call in call representation section **830**.

Call information section **810** of the illustrated embodiment provides various information with respect to a selected or active call. As an example of information that may be presented in call information section **810**, the illustrated embodiment includes information identifying the calling and called parties, such as may be determined from identification and/or validation of a calling or called party by controlled environment information management system **110**, from accessing one or more databases (e.g., billing name and number (BNA), line information database (LIDB), etcetera), and/or the like. Moreover, the calling and/or called party information of the illustrated embodiment includes status information (e.g., inmate, family, attorney, etcetera), such as may be determined by controlled environment information management system **110** and/or from accessing one or more databases (e.g., personal allowed number (PAN) list, government records, internet search results, etcetera). The illustrated embodiment of call information section **810** further includes the called number. Of course, additional or alternative information, such as calling number, calling location, called location, call duration, call type (e.g., collect call, prepaid call, intralata call, etcetera), and/or the like, useful to a particular user may be included in call information section **810**, if desired.

It should be appreciated that call information provided according to embodiments of the invention need not be pas-

31

sively presented. For example, call information section **810** of the illustrated embodiment includes buttons **811** providing interactive information presentation. For example, an investigator may select the "dossier" button to access dossier information, such as may provide detail with respect to a selected individual on the call. Similarly, an investigator may select the "background check" button to initiate and/or access a background report with respect to a selected individual on the call. The "related calls" button may be selected to provide a listing of calls which are related to the presently selected call in one way or another (e.g., having a person in common with the present call, having both persons in common with the present call, originating from a same address, location, facility, number, etcetera as the present call, calls directed to a same address, location, facility, number etcetera as the present call, calls having one or more criteria in common with the present call, and/or the like.

Call information provided according to embodiments of the invention need not be textual based. For example, call information section **810** of the illustrated embodiment includes graphical information **812**. Graphical information **812** may comprise such information of an image (whether still or moving) of one or more parties to the call, one or more video streams from the call (e.g., where the call is multimedia), a map or geographic data showing locations for the calling and/or called parties, etcetera.

Call control section **820** provides various controls and/or control prompts in the illustrated embodiment. For example, prompts **821** may provide a key by which an investigator is reminded or guided in pressing DTMF keys of a telephone for desired bookmarks while monitoring a call. Additionally or alternatively, prompts **821** may be interactive such that a user may select the prompt appearing in call control section **820** in order to place desired bookmarks while monitoring a call. It should be appreciated that the particular keys illustrated are arbitrary and may be varied as desired. For example, a system default may set an initial key configuration which is alterable on a user by user basis to suit individual users.

Call controls provided according to embodiments of the invention need not be textual based. For example, call playback control **822** of the illustrated embodiment provides graphical control input. Specifically, call playback control **822** of the illustrated embodiment includes graphically represented "rewind", "pause", "play", and "fast forward" buttons which may be used by an investigator while monitoring a call in order to control presentation of the call to the investigator.

Call representation section **830** provides a graphical representation of the selected call. For example, the illustrated embodiment provides timeline **831**, as may scroll from right to left on web page **800** as the call progresses, to present a graphical representation of call events represented by one or more of event markers **832-838**. A call may be graphically represented according to embodiments of the invention in forms other than a timeline, such as in a wave form representation, a call flow diagram, etcetera, if desired.

The embodiment of timeline **831** illustrated in FIG. **8** includes various types of call events as well as call events identified by various sources. For example, call events **832-836** are automatically identified through operation of the call processing system, whereas call events **837-839** have been identified by an investigator monitoring the call.

In the illustrated embodiment, call event **832** may represent the calling party having initiated a call attempt (e.g., taking a user terminal off hook), call event **833** may represent the calling party having been identified and/or validated, call event **832** may represent the called party having responded to

32

a call attempt (e.g., taking a user terminal off hook), and call event **834** may represent the called party having agreed to pay for the calling services (e.g., accepted a collect call or given an account from which funds are to be drawn). Each of the foregoing may collectively represent a somewhat typical call flow (or at least call flow beginning) for a call placed using controlled environment information management system. Call event **835** may represent detection of unauthorized or undesired activity during the call, such as an attempt to invoke a three-way call, and thus may represent a somewhat atypical event in a call flow. Call event **836** may represent detection of a particular keyword, such as may have been detected through automated speech analysis (e.g., speech to text and text comparison), spoken by one of the parties to the call. Each of the events represented by call events **832-835** of the illustrated embodiment are preferably automatically detected by logic of the call processing system and placed in their relative positions with respect to timeline **831** to present a graphical representation of the call to a user of web page **800**.

During monitoring of the call, an investigator or other user may place one or more bookmarks as described above. The illustrated embodiment of timeline **831** includes three such bookmarks as an example of operation of this functionality. For example, at a time in the call corresponding to the location of call event **837** on timeline **831**, the investigator may have pressed the DTMF "2" to mark a keyword (e.g., a word spoken in the call which is of interest, but which was not previously included in a list of keywords to be identified automatically by the call processing system). Similarly, at a time in the call corresponding to the location of call event **838** on timeline **831**, the investigator may have pressed the DTMF "4" to mark a place at which a comment is to be inserted. The actual comment may be created in real-time, such as by the investigator speaking the comment, perhaps followed by pressing the DTMF "4" again to close the comment, or may be created after the call, such as after the call is released the investigator may select the icon representing call event **838** to insert, edit, modify, etcetera the comment. At a time in the call corresponding to the location of call event **839** on timeline **831**, the investigator may have pressed the DTMF "3" to mark a person of interest having been referenced in the call. Each of the events represented by call events **837-839** of the illustrated embodiment are preferably identified by a user and placed in their relative positions with respect to timeline **831** to present a graphical representation of the call to a user of web page **800**.

It should be appreciated from the above, that bookmarks or other call event identifiers may be textual or graphical based. Moreover, such bookmarks and/or call event identifiers may comprise audio, such as an audio clip of the associated time in the call, an audio explanation of the bookmark or event identifier (e.g., a spoken keyword or name of a person of interest).

It can be appreciated from the above that browser interfaces utilized according to embodiments of the invention provide a user friendly front end which seamlessly presents relevant information to users, irrespective of the sources, systems, databases, or combinations thereof from which it is obtained. Preferably browser interfaces utilized according the present invention are multimedia capable to facilitate presentation of text data, e.g. inmate records, audio data, e.g., recordings of inmate phone calls, and video data, e.g., photographs and streaming video. Accordingly, an investigator, for example, may listen to recorded calls, listen to live calls, barge into calls, view visitations, conference with other investigators, etcetera using a browser interface of embodiments of the

US 7,860,222 B1

33

invention. Such functionality may be provided anywhere, anytime, using communication links such as may comprise the Internet.

The foregoing investigative tool provides "one-stop shopping" for the investigator. Specifically, the investigator has the power of information across multiple databases to make decisions using an interface easily adopted into their investigative paradigm and providing situation awareness such that the investigator can see all aspects of a facility and/or an individual. Accordingly, an investigator need not monitor every call or other source of information, but instead may pinpoint which calls or information sources they want to concentrate on by more readily identifying those calls or information sources that tend to have the actionable issues and/or desired intelligence. Additionally, the foregoing investigative tool improves productivity for the investigator. For example, the investigator can easily download calls or other information, such as to take the information to court, provide access to information otherwise difficult for an investigator to obtain, facilitate communication with and sharing information between other investigators, etcetera.

Functionality in addition to or in the alternative to that described above may be provided by systems of embodiments of the present invention. For example, hub **610** and/or nodes **621-624** may provide desktop application deployment, such as to distribute appropriate copies of the aforementioned browsers and/or updates thereto, to appropriate ones of the user terminals. Nodes **621-624** may provide such functionality as facility intranet management, such as using a content management server.

Preferably, agencies, individuals, etcetera can establish partner settings to establish what type of information is to be shared and to whom such information is to be shared, such as by establishing multi-level security with respect to particular resources. For example, when an information management system of the present invention, such as such a system used by County A Courthouse **62**-*b*, is coupled to justice information network **61**, a user thereof may provide information as to what type of information County A Courthouse **62**-*b* is agreeable to making available via justice information network **61** and, perhaps, information with respect to particular entities, users, and/or groups which are to be allowed access. The shared information could include, for example, call detail records, inmate dossiers, buying habits, credit, history of an individual's purchases, calls, etcetera. Those identified as authorized to access the information might include similar or corresponding facilities, such as Police Department **63**-*a*, County A Jail **65**-*a*, County B Office **62**-*c* (and perhaps its corresponding facilities), particular individuals, such as management or staff of County A Courthouse **62**-*b*, families and victims of inmates of County A Jail **63**-*a*, and/or the like. Various levels of access may be assigned to one or more of the foregoing and security features implemented, such as network firewalls, secure communication protocols, data encryption and authentication, digital certificates, and/or the like, to protect against unauthorized access.

Although the present invention and its advantages have been described in detail, it should be understood that various changes, substitutions and alterations can be made herein without departing from the invention as defined by the appended claims. Moreover, the scope of the present application is not intended to be limited to the particular embodiments of the process, machine, manufacture, composition of matter, means, methods and steps described in the specification. As one will readily appreciate from the disclosure, processes, machines, manufacture, compositions of matter, means, methods, or steps, presently existing or later to be

34

developed that perform substantially the same function or achieve substantially the same result as the corresponding embodiments described herein may be utilized. Accordingly, the appended claims are intended to include within their scope such processes, machines, manufacture, compositions of matter, means, methods, or steps.

What is claimed is:

1. A system comprising:

a communication services module operable to provide communications between individuals; and

an investigative tools module in communication with said communication service module operable to allow a user to monitor said communications between individuals and to place event identifiers in association with said communications between individuals, said event identifiers comprise a plurality of bookmarks representing different events of interest; and

said investigative tools module comprises a word search module to identify particular words within said communications between individuals and place event identifiers in association therewith.

2. The system of claim **1**, wherein said communication service module comprises a call processor providing communication services with respect to a controlled environment facility, and said user comprises an investigator.

3. The system of claim **1**, wherein said communications between individuals comprise telephone calls.

4. The system of claim **1**, wherein said communications between individuals comprise controlled environment facility visitation calls.

5. The system of claim **1**, wherein said communications between individuals comprise electronic mail communications.

6. The system of claim **1**, wherein said communications between individuals comprise video conferencing communications.

7. The system of claim **1**, wherein said different events of interest comprise an event selected from the group consisting of presence of a threat in said communication, presence of a keyword in said communication, reference to a person of interest in said communication, and placing of a comment with respect to said communication.

8. The system of claim **1**, wherein said events of interest represented by said plurality of bookmarks are defined by said user.

9. The system of claim **1**, wherein said investigative tools module comprises an event detection module to identify a particular event being initiated with respect to said communications between individuals and place event identifiers in association therewith.

10. The system of claim **1**, wherein said investigative tools module further allows said user to control one or more aspects of said communications between individuals.

11. The system of claim **10**, wherein said one or more aspects comprises termination of a monitored one of said communications between individuals.

12. The system of claim **10**, wherein said one or more aspects comprises muting at least one party of a monitored one of said communications between individuals.

13. The system of claim **10**, wherein said one or more aspects comprises said user barging into a monitored one of said communications between individuals.

14. The system of claim **1**, wherein said investigative tools module comprises a data interface providing information associated with a monitored one of said communications between individuals to said user.

US 7,860,222 B1

35

**15**. The system of claim **1**, wherein said information associated with said monitored one of said communications between individuals comprises a communication timeline having said one or more said event identifiers placed in association therewith.

**16**. The system of claim **1**, wherein said information associated with said monitored one of said communications between individuals comprises identification of at least one of said individuals.

**17**. The system of claim **1**, wherein said information associated with said monitored one of said communications between individuals comprises interactive information presentation allowing said user to obtain additional desired information.

**18**. The system of claim **1**, wherein said information associated with said monitored one of said communications between individuals comprises prompts to guide said user with respect to said placing event identifiers.

**19**. The system of claim **1**, wherein said information associated with said monitored one of said communications between individuals comprises controls to facilitate said user controlling one or more aspect of said monitoring said a selected one of said communications between individuals.

**20**. The system of claim **1**, wherein said data interface comprises an interactive web page.

**21**. A method comprising:

providing communications between individuals;

recording said communications between individuals;

monitoring said communications between individuals, said monitoring comprises logic of a call processing system analyzing content of said communications between individuals; and

placing a plurality of event identifiers in association with a recorded one of said communications between individuals based upon events detected by said monitoring.

**22**. The method of claim **21**, wherein said monitoring comprises placing a user in communication with a select one of said communications between individuals.

**23**. The method of claim **22**, wherein said monitoring comprises said user monitoring said select one of said communications between individuals in real-time.

**24**. The method of claim **22**, wherein said monitoring comprises said user monitoring a recording of said select one of said communications between individuals.

**25**. The method of claim **22**, wherein said placing a plurality of event identifiers comprises said user signaling a point in

36

said select one of said communications between individuals for an event identifier to be placed.

**26**. The method of claim **22**, wherein said placing a plurality of event identifiers comprises said user signaling a particular event identifier to be placed in association with said select one of said communications between individuals.

**27**. The method of claim **22**, wherein said placing a plurality of event identifiers comprises said user inputting a comment in association with said select one of said communications between individuals.

**28**. The method of claim **22**, wherein said select one of said communications between individuals is automatically selected based upon criteria defined by said user.

**29**. The method of claim **21**, wherein at least one of said individuals comprises an inmate in a prison facility.

**30**. The method of claim **29**, wherein said user comprises an investigator.

**31**. The method of claim **21**, further comprising:

presenting information associated with a select one of said communications between individuals to a user.

**32**. The method of claim **31**, wherein said information associated with said select one of said communications between individuals comprises a communication timeline having appropriate ones of said plurality of event identifiers placed in association therewith.

**33**. The method of claim **31**, wherein said information associated with said select one of said communications between individuals comprises identification of at least one of said individuals.

**34**. The method of claim **31**, wherein said information associated with said select one of said communications between individuals comprises interactive information presentation allowing said user to obtain additional desired information.

**35**. The method of claim **31**, wherein said information associated with said select one of said communications between individuals comprises prompts to guide said user with respect to said placing event identifiers.

**36**. The method of claim **31**, wherein said information associated with said select one of said communications between individuals comprises controls to facilitate said user controlling one or more aspect of said monitoring said communications between individuals.

\*    \*    \*    \*    \*

## United States Court of Appeals
## for the Federal Circuit

*Securus Technologies, Inc. v. Global Tel Link Corporation,* 2016-1992

### CERTIFICATE OF SERVICE

I, Daniel F. Olejko, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On **August 19, 2016**, I electronically filed the foregoing **APPELLANT SECURUS TECHNOLOGIES, INC.'S CORRECTED OPENING BRIEF** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

> Jon Wright (Principal Counsel)
> Ross G. Hicks
> Michael Bradley Ray
> Michael D. Specht
> Sterne Kessler Goldstein & Fox, PLLC
> 1100 New York Avenue, NW
> Washington, DC 20005
> 202-772-8825
> jwright@skgf.com
> rhicks@skgf.com
> mray@skgf.com
> mspecht@skgf.com

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

August 19, 2016

*/s/ Daniel F. Olejko*
Daniel F. Olejko

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

__X__ The brief contains 7,841 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

__X__ The brief has been prepared in a proportionally spaced typeface using M.S. Word 2013 in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using _____ _____in a ___ characters per inch_____ font.

Dated: August 19, 2016              _/s/ Jeffrey Bragalone_____
                                    Jeffrey R. Bragalone
                                    BRAGALONE CONROY PC

                                    *Counsel for Appellant*
                                    *Securus Technologies, Inc.*